FIRST MIDWEST TRUST COMPANY, as Adm'r of the Estate of Jerry Mallady, Deceased, et al., Plaintiffs-Appellants and Cross-Appellees, v. PAUL TY ROGERS et al., Defendants-Appellees and Cross-Appellants.

Fourth District No. 4—96—0788

Argued September 23, 1997.—Opinion filed April 3, 1998.—Modified on denial of rehearing May 29, 1998.

John F. Martin (argued) and David J. Ryan, both of Dukes, Martin, Ryan, Meyer & Krapf, Ltd., of Danville, for appellants.

Karen L. Kendall (argued), of Heyl, Royster, Voelker & Allen, of Peoria, and James C. Kearns, and Fred K. Heinrich, both of Heyl, Royster, Voelker & Allen, of Urbana, and Stephen L. Corn (argued) and Kathleen M. Stockwell, both of Craig & Craig, of Mattoon, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In July 1993, plaintiffs Jerry Mallady and his wife Gaythel sued defendants, Paul Ty Rogers and the Town of Arcola (Arcola), for damages resulting from a collision between Jerry's automobile and a snowplow driven by Rogers during the course of his employment with Arcola. In July 1996, the jury awarded damages based on Rogers' negligence and found Jerry 50% comparatively negligent.

Plaintiffs appeal, arguing that (1) an enforceable settlement agreement existed; (2) defendants' reconstruction expert should not have been allowed to testify; (3) the trial court erred by allowing defendants to present section 11—205 of the Illinois Vehicle Code (Code) (625 ILCS 5/11—205 (West 1992)) to the jury; (4) the court should have set aside the comparative negligence finding and entered a judgment notwithstanding the verdict (judgment *n.o.v.*) on liability; and (5) the damages award is inadequate. Defendants cross-appeal, arguing that the court erred by (1) denying defendants' motion to reduce the damages award by the amount of funeral expenses and medical expenses for which plaintiffs had no liability; and (2) failing to apply section 2—1115.1(a) of the Code of Civil Procedure, as amended (735 ILCS 5/2—1115.1(a) (West Supp. 1995)), to limit the damages award for count III. We affirm in part, vacate in part, reverse in part and remand with directions.

## I. BACKGROUND

### A. The Accident

On February 26, 1993, Rogers was working for Arcola plowing county roads in that township. Rogers stopped at the intersection of County Road 500N and Route 45, looked in both directions, and began to drive across Route 45. Jerry was driving north on Route 45 and collided with the snowplow. Rogers testified that he did not see Jerry's car. He later pleaded guilty to the offense of failure to yield the right-of-way (625 ILCS 5/11—904 (West 1992)).

Jerry suffered severe injuries, including a closed head injury resulting in bleeding into the brain, facial lacerations, multiple rib fractures, a lacerated and ruptured lung, broken left leg and hip, dislocated hip, and right ankle, spinal, skull, and jaw fractures for which he underwent several surgical procedures. He remained hospitalized for 3½ months during which he was given an artificial airway and feeding tube and placed on a respirator. He remained in a coma for many months, gradually regaining consciousness during the summer of 1993. In June 1993, he was moved to a nursing home. He had continuous difficulty with infections and was occasionally readmitted to the hospital for treatment. In September 1993, he returned to the hospital for rehabilitation.

In December 1993, he was discharged to the Odd Fellows Nursing Home, where Dr. Mark Dettro took charge of his medical care. Dr. Dettro testified that Jerry's head injury had caused a central nervous system dysfunction, leaving him unable to walk, speak, swallow, feed himself, or reposition himself in bed. He never regained those functions, receiving all food, liquid, and medication through a feeding tube and spending 95% of his time in bed. On October 14, 1995, Jerry died of pneumonia. Jerry's medical treatment and nursing home care costs totaled $761,531.70.

### B. Procedural History

In July 1993, Jerry and Gaythel sued defendants for negligence and loss of consortium. In April 1995, the circuit court appointed (1) First Midwest Trust Company (First Midwest) as guardian of Jerry's estate and (2) Gaythel as guardian of Jerry's person. In June 1995, they were substituted as party plaintiffs for Jerry.

Jerry died at 4:45 p.m. on October 14, 1995, and on October 16, 1995, the circuit court appointed Gaythel as special administrator for Jerry's estate. The parties had negotiated throughout the pretrial period and plaintiffs claim that they had agreed to settle on October 14, 1995, two days prior to trial. On October 19, 1995, plaintiffs filed a motion to compel settlement. The trial court denied the motion in February 1996.

In March 1996, Gaythel, individually and as administrator for Jerry's estate, filed an amended complaint adding a cause of action for wrongful death. In April 1996, the trial court granted Gaythel's motion to substitute First Midwest as administrator for Jerry's estate. The final complaint alleged 16 counts, including causes of action based on negligence against both Rogers and Arcola for (1) survival, (2) family expenses, (3) loss of consortium, and (4) wrongful death.

Following a trial in July 1996, the jury returned a verdict finding defendants negligent and awarding damages for each of three counts, as follows: count I, survival action: verdict—$1,504,708.50; count II, loss of consortium: verdict—$755,000; and count III, wrongful death: verdict—$1 million. The jury also found Jerry 50% comparatively negligent and reduced his damages awards to $774,354.25, $377,500, and $500,000, respectively, for a total of $1,651,854.25.

## II. THE PURPORTED SETTLEMENT AGREEMENT

Plaintiffs first argue that a valid settlement agreement existed for the trial court to enforce and the court erred by denying their motion to compel settlement. We disagree.

The parties began negotiating prior to trial and continued to do so before the trial was scheduled to begin on October 16, 1995. On October 14, 1995, the parties' attorneys talked again and discussed a settlement figure of $4.5 million. Plaintiffs claim that the parties had agreed to settle at this amount, based on a 2:30 p.m. recorded telephone message between the parties' attorneys.

On October 13, 1995, Jerry went to the hospital to have his feeding tube replaced. He returned to the nursing home after the procedure, but his condition worsened and he was readmitted to the hospital at about 2:30 a.m. on October 14, 1995. Gaythel arrived at the hospital at about 3 a.m. She telephoned her son Shawn at about 6 a.m. and told him that Jerry was in serious condition.

Around 8 a.m., Shawn telephoned Carroll Dukes (the attorney representing Gaythel and the guardians of Jerry's person and estate). Shawn told Dukes that Jerry was hospitalized and asked him what effect this would have on the trial that was set to begin two days later. Dukes informed him that this was another reason why settlement should be pursued. Dukes told Shawn that he would recommend settlement if defendants would "come up with [about] $4,500,000." Shawn agreed with the suggestion. Later that day, Gaythel agreed with Shawn, but she did not speak to Dukes about it.

After talking with Shawn, Dukes telephoned Jim Kearns, an attorney for defendants, around 9 a.m. on October 14, 1995, concerning the settlement negotiations. Dukes indicated that he was preparing

for trial, but that defendants' October 12, 1995, settlement letter suggested that there might be a chance for settlement. Kearns indicated that defendants would probably settle for $4.5 million and that he would recommend that amount. Dukes stated that he wanted to settle the matter that day. Dukes did not tell Kearns that Jerry had been hospitalized that morning. At the end of the telephone conversation, Dukes informed Kearns that he would be unavailable during the day and that Kearns could leave his response on Dukes' telephone answering machine.

Around 3 p.m. on October 14, 1995, Kearns called Dukes and left the following message on his answering machine:

> "Carroll, this is Jim Kearns. I'm calling. I think we got a deal. A couple of loose ends to be tied up, but I don't think it's anything critical. The money number is the County's or the Township's willing to accept that number so long as you understand we don't have the money until we get a bond issue floated and we'll do that as fast as we can, but we don't really have a feel for how long that takes. Also, we have to have a release from the children of any potential wrongful death claim, but I don't see any one of those as a problem. I'm sure you understood both of those to be the case, but I was supposed to specifically mention those things. So, I'll be here this evening if you want to talk about it or we can just talk sometime before Monday ***."

Before Dukes called Kearns back, Dukes received a message from Shawn informing him that Jerry had died around 4:45 p.m. that afternoon (October 14, 1995). At 6:43 p.m. that same day, Dukes left a message on Kearns' answering machine, indicating that the $4.5 million and the two conditions were acceptable.

At some point after Dukes left the 6:43 p.m. message on Kearns' machine, Kearns learned from a third party that Jerry had died earlier in the day. Kearns telephoned Dukes and they discussed Jerry's death and the effect it might have on the settlement discussions. Kearns indicated to Dukes that they may have a valid settlement, but that he wished to research the matter further before arriving at a final decision.

The trial court provided a detailed and cogent analysis in its nine-page memorandum of decision denying plaintiffs' motion to compel settlement. The court found that (1) Dukes' 9 a.m. phone conversation constituted continuing negotiations, not an offer; (2) even if Dukes' statements during that call constituted a valid offer, Kearns' 3 p.m. telephone message was a counteroffer, not a valid acceptance; (3) Kearns' 3 p.m. message can best be characterized as an offer; and (4) Dukes' telephone call to Kearns at 6:43 p.m. was a valid

acceptance of Kearns' 3 p.m. offer. Nevertheless, the trial court concluded that the purported settlement agreement was not enforceable because Jerry died at 4:36 p.m., raising doubt about Dukes' authority to settle. We agree with the court's conclusion; more particularly, for the reasons discussed below, we conclude that the matter is resolved by the limits placed on Dukes' authority by sections 24—19(a) and 10—4 of the Probate Act of 1975 (Act) (755 ILCS 5/24—19(a), 10—4 (West 1994)).

■ The trial court questioned Dukes' authority to settle by considering whom he represented at the time he accepted Kearns' offer. Before Jerry died, Dukes represented First Midwest, as guardian of Jerry's estate, and Gaythel, both individually and as guardian of Jerry's person. A guardian's status is governed by section 24—12 of the Act, which provides that "[t]he office of a representative of a ward *terminates*[,] *** subject to [s]ection 24—19, when the ward dies." (Emphasis added.) 755 ILCS 5/24—12 (West 1994). (Section 1—2.15 of the Act includes guardian in its definition of "representative." 755 ILCS 5/1—2.15 (West 1994).) Thus, once Jerry died, the offices of guardianship held by First Midwest and Gaythel terminated, except as outlined in section 24—19 of the Act.

Section 24—19(a) of the Act provides, in pertinent part, that "[w]ithout order of appointment and until the issuance of letters testamentary or of administration or until sooner discharged by the court, a representative of the estate of a deceased ward has the powers and duties of an administrator to collect." 755 ILCS 5/24—19(a) (West 1994). After Jerry died, First Midwest could only represent Jerry's estate as an "administrator to collect." Section 10—4 of the Act defines the duties and powers of an administrator to collect, in pertinent part, as follows: "An administrator to collect has power to sue for and collect the personal estate and debts due the decedent *** and by leave of court to exercise the powers vested by law in an administrator." 755 ILCS 5/10—4 (West 1994). Thus, the authority of an administrator to collect is limited to *preserving* an estate. *In re Estate of Breault*, 29 Ill. 2d 165, 179, 193 N.E.2d 824, 832 (1963).

■ After Jerry died, Dukes still represented First Midwest, as guardian of Jerry's estate, and Gaythel, as guardian of Jerry's person, but section 10—4 of the Act limited First Midwest's authority as guardian to preserving Jerry's estate. As an administrator to collect, it had no authority to accept a settlement offer. Moreover, because section 24—19(a) of the Act does not address a representative of the person, Gaythel's office of guardianship terminated upon Jerry's death. In fact, it appears that, during the interim between Jerry's death and the appointment (on October 16, 1995) of Gaythel as

administrator for Jerry's estate, *no one* had the authority to agree to a settlement. Because Dukes' authority as agent for the guardians could not exceed his principals' authority, Dukes exceeded his authority when he accepted the settlement offer. Accordingly, no valid settlement agreement existed for the trial court to enforce, and the trial court correctly denied plaintiffs' motion to compel settlement.

## III. ACCIDENT RECONSTRUCTION TESTIMONY

Plaintiffs next argue that the trial court erred by allowing defendants' accident reconstruction expert, Professor Louis Metz, to testify. Specifically, they contend that Metz's experiment and the opinions based thereon fail to meet admissibility standards. We agree.

Prior to trial, plaintiffs filed motions *in limine* objecting to Metz's testimony on several grounds, including the following: (1) accident reconstruction testimony should not be admitted when eyewitness testimony is available; (2) Metz's proposed testimony did not meet the standards for admissibility of expert reconstruction testimony because it lies within the ken of the average juror; (3) Metz's testimony was based on unreliable data because experimental conditions did not substantially replicate the conditions at the time of the accident; and (4) Metz's testimony was highly speculative. In ruling upon plaintiffs' motions, the trial court considered Metz's deposition testimony, which showed that (1) weather and road conditions during the experiment differed substantially from conditions at the time of the accident; (2) Metz's methodology was subjective; (3) he made several assumptions regarding the conduct of Rogers and Jerry; and (4) he was unable to use his usual formula for calculating experimental values. Despite these deficiencies in Metz's proposed testimony, the court denied all of plaintiffs' motions to bar it, and Metz testified at trial substantially the same as his deposition testimony.

Metz's testimony showed that he is a recognized expert in the field of accident reconstruction. He conducted an experiment in May 1995 in which he sought to have Rogers reenact his driving on the day of the collision to determine whether Jerry contributed to the accident. At his deposition, Metz stated:

> "What I tried to do was estimate the speeds of the two vehicles at impact. I calculated their relative speeds with a momentum analysis. I estimated the absolute speed of [Rogers' snowplow] from experimental data which I took on 9 May [1995], and then I did some calculations *** to show where [Jerry] would have been at the moment that [Rogers] began to move [forward from the stop sign]."

One of the values Metz needed to complete his calculations is the common velocity of the vehicles after collision, which is normally

calculated using a formula based on the friction characteristics of the road (friction coefficient) and how far the two vehicles slid. However, Metz was unable to use the normal formula because (1) the vehicles rolled over rather than slid; and (2) he was unable to determine the friction coefficient for Route 45. Instead, Metz designed an experiment to provide him with the necessary information.

Metz described his experiment as follows:

> "I had Mr. Rogers stop at the stop sign as he testified he did on the day of the accident. I instructed him to drive the vehicle straight across the road as closely as he could remember to the way he drove it when the accident occurred and I had him repeat it two or three times to get the feel of it and we took five successive runs' worth of data."

In his deposition, Metz acknowledged that he did not know of any authority in the literature for utilizing this type of experiment for reconstruction, but stated, "I've done it many other times, both experimentally and theoretically."

As a result of this experiment, Metz determined that Rogers' vehicle was moving at "a little over seven miles per hour" at the time of the collision. He based all other calculations and his opinions on this experimental data.

Metz calculated Jerry's speed at impact (37 to 38 miles per hour). He then calculated the distance it would take Jerry to stop his vehicle, based on (1) a normal perception reaction time (the interval between first perceiving danger and then reacting to it) beginning when Rogers first pulled away from the stop sign; (2) an assumed friction coefficient for Route 45 of 0.7; and (3) two different assumptions for the speed of Jerry's vehicle, 55 miles per hour and 40 miles per hour. Based on either speed assumption, he concluded that Jerry could have avoided the accident by "simply lifting his foot off of the throttle when Mr. Rogers first began to move from the stop sign."

On cross-examination, Metz testified that the stop sign was located about 30 feet back from the edge of Route 45, and Jerry was traveling north in the lane farthest away from Rogers' vehicle. When Jerry first saw the snowplow move, it would have been moving slowly, having 30 feet within which to come to a stop before it even reached the west side of Route 45 (at the southbound lane). According to Metz, Jerry could reasonably have assumed that (1) the snowplow was going to (a) stop again at the highway's edge, or (b) turn south on Route 45 (rather than cross it); and, (2) if he could see the snowplow, its driver could see him.

## A. Metz's Experimental Evidence

■ Generally, the admissibility of experimental evidence depends

upon the proponent's ability to show that the essential conditions of the experiment were the same as those at the time of the accident. *Van Steemburg v. General Aviation, Inc.*, 243 Ill. App. 3d 299, 323, 611 N.E.2d 1144, 1161 (1993). In *Ford v. City of Chicago*, 132 Ill. App. 3d 408, 416, 476 N.E.2d 1232, 1239 (1985), the court stated:

> "The admissibility of an experiment depends upon whether the conditions of the experiment are substantially similar to the actual circumstances of the particular case, although the conditions need not be identical. [Citation.] *Experiments are incompetent* as evidence where they do not duplicate the essential conditions existing at the time of the accident which gave rise to the litigation." (Emphasis added.)

The trial court's determination of admissibility of experimental evidence lies within its sound discretion, and a reviewing court will not reverse absent an abuse of such discretion. *Van Steemburg*, 243 Ill. App. 3d at 323, 611 N.E.2d at 1161.

■ In this case, the essential conditions include (1) the road configuration, (2) road conditions, (3) weather conditions, (4) the snowplow vehicle, and (5) Rogers' driving. Two conditions were similar; the road configuration had not changed and the snowplow used was the same one Rogers had driven the day of the collision. (The snowplow supposedly contained an amount of rocks to replicate the amount of snow it contained on the day of the collision, but Metz admitted it was impossible to know whether it was loaded identically.) However, other essential conditions of the experiment differed substantially from conditions on the day of the collision—namely, the road and weather conditions and Rogers' driving. Rogers testified that on the day of the accident, it had been snowing, the sky was gray and overcast, and snow was on the roads. In contrast, on the day of the reenactment, the roads were clear and dry and it was not snowing.

Metz conceded that he was unable to completely reconstruct this accident because the weather was very different on the morning of the collision. He also had essentially no information regarding the road surface conditions on Route 45 and County Road 500N or their friction coefficients.

More important, Metz admitted that his methodology was subjective. He asked Rogers to drive the snowplow in a manner similar to the way he drove on the day of the collision. Regarding the effect of Rogers' driving on the experiment results, Metz testified: "If Mr. Rogers had accelerated on the day of the accident fast enough to spin his wheels, let's say, then the ultimate traction between tire and snow would make a difference, but he accelerated[,] in fact, very gently

[during the experiment] and anyone can do that." Putting aside Rogers' self-interest in driving particularly carefully during the experiment, we note that Metz recorded five trials with times varying from 7 to 10 seconds, a difference of 30%, according to Metz. Metz then used the mean derived from these five trials to perform his calculations.

In the present case, the road and weather conditions—two essential conditions—during the experiment varied significantly from those at the time of the collision. Additionally, the trial court had no way of knowing whether Rogers' driving duplicated his driving at the time of the collision. Because the essential conditions of the experiment varied significantly from those existing at the time of the collision giving rise to litigation, the court here should have excluded the evidence derived from the experiment. Thus, we hold that the court's failure to do so constituted an abuse of discretion. *Ford*, 132 Ill. App. 3d at 416, 476 N.E.2d at 1239.

## B. The *Frye* Standard

Even if Metz had been able to duplicate the essential conditions of the collision other than Rogers' driving, and even if Rogers had made his best good-faith effort to duplicate his driving at the time of the collision, it is likely that such an experiment could never be sufficiently reliable to be admissible as a matter of law. This is so because the experiment fails to meet the standards for admissibility of novel scientific evidence enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), which Illinois follows. *People v. Miller*, 173 Ill. 2d 167, 187, 670 N.E.2d 721, 731 (1996).

In *Frye*, the court wrote that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. The determination of whether a party has met the *Frye* standard lies within the trial court's discretion, and a reviewing court will not reverse absent an abuse of that discretion. *Miller*, 173 Ill. 2d at 187, 670 N.E.2d at 731.

In applying the *Frye* standard, the trial court must determine that (1) the scientific test is reliable; and (2) the test's reliability is generally accepted in the particular scientific field to which the test belongs. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.4, at 562-63 (6th ed. 1994) (hereafter Handbook of Evidence). If the basis of an expert's opinion includes so many varying or uncertain factors that he is required to guess or surmise to reach an

opinion, the expert's opinion is too speculative to be reliable. *Dyback v. Weber*, 114 Ill. 2d 232, 244, 500 N.E.2d 8, 13-14 (1986); *Baird v. Adeli*, 214 Ill. App. 3d 47, 65, 573 N.E.2d 279, 290 (1991).

Adopting the *Frye* standard requires courts to rely somewhat on the "community" of experts to help the courts decide admissibility. *Mercado v. Ahmed*, 756 F. Supp. 1097 (N.D. Ill. 1991). However, even when proponents can make a colorable claim that a particular experiment has been accepted by the appropriate scientific community, the courts still may not delegate their authority to the scientific community. Indeed, had the trial court here admitted Metz's experimental evidence on the basis that the scientific community had somehow accepted Metz's methodology, this court would still hold that such a determination constituted an abuse of discretion because the experimental data is inherently unreliable.

In the present case, Metz assumed that (1) Jerry could see the snowplow even though Rogers testified that he did not see Jerry's vehicle; and (2) a reasonably prudent person would perceive imminent danger and begin to take evasive action as soon as Rogers pulled out from the stop sign—which was located 30 feet west of Route 45. (These assumptions are questionable, as Metz admitted in his deposition.) He then calculated Jerry's perception reaction time beginning when Rogers initially pulled away from the stop sign and concluded that, if Jerry had taken his foot off the accelerator at that point, the collision would not have occurred. Further, as plaintiffs pointed out, Metz was unable to use the usual scientific formula for deriving the common speed of the two vehicles after impact because several factors were unknown (including the friction coefficients of the road surface and the speeds of the vehicles prior to impact). Thus, Metz's testimony was based on highly speculative data and dubious assumptions.

In addition, Metz's purported scientific testimony was based on a formula and methodology he created. Defendants point to no scientific literature addressing or testing this method, nor to any scientist or expert (other than Metz himself) using such an experiment in accident reconstruction. In fact, Metz admitted that, although he had used this type of experiment many times, he knew of no authority in the scientific literature that supported it.

In this case, the experiment results provided the foundation for all of Metz's calculations, conclusions, and opinions. Yet the experiment's reliability and validity are highly questionable because of the differing conditions, subjective methodology, and assumptions on which it was based. In our judgment, these factors should have led the trial court to reject the experiment's reliability under the *Frye* standard.

Moreover, we note that, even under the more liberal *Daubert* standard for the admissibility of novel scientific evidence (*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95, 125 L. Ed. 2d 469, 483-84, 113 S. Ct. 2786, 2797-98 (1993)), the party presenting the expert must still show that the expert's findings are based on sound science, as opposed to unscientific speculation—as in the present case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); see *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993) ("The elimination of formal barriers to expert testimony has merely shifted to the trial judge the responsibility for keeping 'junk science' out of the courtroom"); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (the trial court must determine whether scientific evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist); *Joiner v. General Electric Co.*, 78 F.3d 524, 530 (11th Cir. 1996) (the trial court must find that scientific evidence is "indeed scientifically legitimate, and not 'junk science' or mere speculation").

## IV. ADMISSIBILITY OF SECTION 11—205 OF THE CODE

Plaintiffs next argue that the trial court erred by allowing defendants to present section 11—205 of the Code (625 ILCS 5/11—205 (West 1994)) to the jury. We agree.

Section 11—205 of the Code provides, in pertinent part, as follows:

> "(a) The provisions of [the Vehicle Code] applicable to the drivers of vehicles upon the highways shall apply to the drivers of all vehicles owned or operated by *** any *** town, district[,] or any other political subdivision of the State, except as provided in this Section ***.
>
> * * *
>
> (f) Unless specifically made applicable, the provisions of this Chapter *** *shall not apply* to persons, motor vehicles[,] and equipment *while actually engaged in work upon a highway* but shall apply to such persons and vehicles when traveling to or from such work." (Emphasis added.) 625 ILCS 5/11—205 (West 1994).

Several courts have addressed the construction of section 11—205(f) of the Code. In *Creamer v. Rude*, 37 Ill. App. 2d 148, 185 N.E.2d 345 (1962), the court applied the statute to the driver of a snowplow who had stopped to spread cinders to assist a stalled truck. In so doing, the court concluded that the driver was "actually engaged in work upon the surface of the highway," pursuant to the statute. *Creamer*, 37 Ill. App. 2d at 157, 185 N.E.2d at 348.

In the more recent case of *Townsend v. Gaydosh*, 197 Ill. App. 3d 339, 343-44, 554 N.E.2d 648, 651 (1990), this court stated that sec-

tion 11—205(f) of the Code was "designed to protect State workers from traffic violation liability while performing road work construction, *i.e.*, enabling the driver to drive the grader the wrong way on the wrong side of the road in order to repair and smooth over a bump on the pavement."

■ At trial, defendants did not claim that the statute applied to Rogers; instead, they sought to present the statute as evidence supporting their claim that Jerry was contributorily negligent. However, if the statute does not apply to Rogers, then its presentation to the jury involved a question of relevance. Irrelevant evidence is not admissible. *Clemons v. Mechanical Devices Co.*, 292 Ill. App. 3d 242, 247-51, 684 N.E.2d 1344, 1347-50 (1997); Handbook of Evidence § 402.1, at 178. Even relevant evidence may contain drawbacks of sufficient importance to call for its exclusion, including unfair prejudice, confusion of the issues, and misleading the jury. Handbook of Evidence § 403.1, at 178. See *Gill v. Foster*, 157 Ill. 2d 304, 313, 626 N.E.2d 190, 194 (1993) ("Even relevant evidence may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury"). Thus, if a piece of evidence has slight probative value, *any* prejudicial effect on the jury may require exclusion. Moreover, if the evidence is merely confusing and creates uncertainty, that alone may suffice to tip the balance in favor of exclusion when the information sought to be presented contains negligible probative value.

One of the tests that a trial court may use when evaluating relevance is to ask how it would view this evidence if it were the trier of fact. Would the proposed evidence assist the trial court in resolving questions of fact? See *Yamnitz v. William J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 250, 621 N.E.2d 1046, 1050 (1993) (offered evidence is relevant if it renders a matter in issue more or less probable in light of logic and experience). If not, then the evidence should be excluded. The court may also use the following indicator: if the proponent of the evidence has difficulty even articulating the basis for admissibility at trial—as in this case—that constitutes the judicial equivalent of a cautionary yellow stoplight.

■ On appeal, defendants have abandoned the basis for admission they asserted at trial. Instead, they now claim that the statute does indeed apply to Rogers; thus, he was not obligated to yield the right-of-way to Jerry. Defendants reason that, as a licensed driver, Jerry was charged with knowledge of the rules of the road, including section 11—205(f) of the Code. Therefore, he should have (1) known that Rogers had no duty to stop before crossing Route 45, and (2) immediately acted to prevent a collision. Based on this assumption and

Metz's testimony that Jerry could have avoided the collision, defendants contend that the statute provides evidence that Jerry was negligent. We are not persuaded.

In this case, Rogers was simply driving the snowplow across the highway at the time of the collision, which involved no use of the truck that required Rogers to drive in a manner that violated the Code. The legislature could not have intended that a snowplow driver may blithely and routinely ignore traffic regulations, especially when—as here—he has his plow lifted and is merely driving across a preferential highway.

Moreover, Rogers testified that he was trained to stop for stop signs and yield to cross traffic, and his supervisor confirmed that testimony. Rogers pleaded guilty to the offense of failing to yield the right-of-way, and plaintiffs introduced that guilty plea into evidence.

Under the circumstances of this case, we conclude that section 11—205(f) of the Code does not apply to Rogers and it was thus wholly irrelevant to the issues in this case. Accordingly, we hold that the trial court erred by admitting evidence pertaining to the statute.

The material in section V is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

## VI. DAMAGES

Defendants cross-appeal, arguing that the trial court erred in awarding damages. Specifically, defendants contend that the damages award for count I, the survival action, should be reduced by amounts for (1) funeral and memorial expenses; (2) medical expenses that were subject to being written off by medicare and public aid; and (3) medical expenses for which Jerry and his family bear no liability—namely, those benefits covered by Jerry's health maintenance organization (HMO), PersonalCare.

The material in sections A and B is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

### C. Medical Expenses Covered by Jerry's HMO

#### 1. *The Collateral Source Rule*

Defendants next argue that the damages award for count I should be reduced by the amount of medical expenses for which Jerry and his family bear no liability—namely, those expenses covered by Jerry's HMO. Specifically, defendants contend that the collateral source rule does not apply to services provided by Jerry's HMO because Jerry was never liable for $377,582.92 worth of medical services provided by Covenant Medical Center (Covenant) and Christie Clinic Association (Christie) hospitals. In contrast, an insurance policyholder

who receives medical services is liable to the medical care provider and, in turn, the insurance company is obligated to reimburse the policyholder for covered expenses. In response, plaintiffs argue that the collateral source rule applies here. We agree with plaintiffs.

PersonalCare, Jerry's HMO, supplies managed care services. It is owned by a company that is affiliated with Christie and a company that is part of the hospital system that owns Covenant.

Jerry was a member of PersonalCare by virtue of an agreement that provided that Jerry would receive certain health care benefits in return for paying PersonalCare a monthly premium of about $400. The agreement was in effect on the date Jerry was injured and continued in effect until August 31, 1994.

Lisa Pellum, business services manager for Christie, testified that Jerry received services for which the usual and customary charges were $28,008.95. Because he was a member of PersonalCare, Jerry was responsible for only $6,080.70 of that amount.

Similarly, Nancy Pecora, patient financial counselor at Covenant, testified that Jerry was only responsible for $14,745.54 of $410,107.10 for Covenant's services. (The public aid and medicare write-offs, discussed above, were deducted from Covenant's total.) In offers of proof outside the jury's presence, Pecora testified that PersonalCare would have paid Covenant a certain amount, called a capitation payment, regardless of whether the hospital treated Jerry. When Jerry was treated, that capitation payment was allocated to his treatment. Defendants contend that PersonalCare does not pay Covenant the money "by virtue of [Jerry's] treatment"; instead, the allocation is simply an accounting procedure.

Whether the collateral source rule applies to HMO benefits is an important policy question that has arisen as a result of fundamental changes in the health care system. Although the legislature has not addressed this issue, our review of the philosophical underpinnings of the rule leads us to conclude that the rule applies in this case.

■ The collateral source rule states that benefits received by an injured party from a source wholly independent of, and collateral to, a tortfeasor will not diminish damages otherwise recoverable from the tortfeasor. *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320-21, 546 N.E.2d 524, 530 (1989). The rationale for the collateral source rule is that a wrongdoer should not benefit from expenditures made by the injured party, or take advantage of contracts or other relations which exist between the injured party and third persons. *Wilson*, 131 Ill. 2d at 320, 546 N.E.2d at 530. Although injured parties may receive a windfall from the collateral source rule, it is usually considered more just for an injured party to receive the windfall than

for a wrongdoer to be relieved of full responsibility for his wrongdoing. *Wilson*, 131 Ill. 2d at 321-22, 546 N.E.2d at 530-31.

 This rationale applies equally to an injured party who contracts with an HMO for medical benefits. From Jerry's point of view, the contract he entered into with PersonalCare was equivalent to an insurance policy. He did not care what sort of accounting methods his HMO used or whether the providers of his medical care were business partners or owners of the HMO. To reduce the damages award in this case would allow defendants to benefit from Jerry's decision to purchase health coverage from an HMO rather than from a conventional insurance company. Although HMOs differ from insurance companies in significant ways, those differences do not subvert the philosophical foundation of the collateral source rule. We reject defendants' attempt to distinguish HMO benefits from insurance benefits. The fact remains that the benefits Jerry received as a result of his PersonalCare membership are collateral to defendants. Accordingly, we conclude that the collateral source rule applies to the medical expenses covered by Jerry's HMO.

### 2. Section 2—1205.1 of the Code of Civil Procedure

 Alternatively, defendants seek to apply section 2—1205.1 of the Code of Civil Procedure (Procedural Code) (735 ILCS 5/2—1205.1 (West 1992)) to the damages award, which would reduce it by $342,982.92 ($377,582.92 less $25,000, less $9,600 for two years' premiums). (Section 2—1205.1 provides that a judgment will be reduced by any amount in excess of $25,000 of the benefits provided for medical or hospital charges, but such reduction does not apply to the extent that there is a right of recoupment through subrogation, lien, or otherwise. 735 ILCS 5/2—1205.1 (West 1992).)

In response, plaintiffs contend that the costs for the medical services Jerry received were subject to recoupment; therefore, the section 2—1205.1 reduction does not apply. They claim that the agreement between PersonalCare and Jerry specifically provides for such recoupment. We agree with plaintiffs.

Regarding Jerry's repayment obligation, that agreement provides as follows:

> "IX. RIGHT OF REIMBURSEMENT. For benefits provided by PersonalCare under this certificate, PersonalCare shall be entitled to reimbursement and shall succeed to any right of recovery *** against a third party responsible for the member incurring benefits.
>
> * * *
>
> The member, or anyone acting on his behalf, agrees:
>
> * * *

D. That PersonalCare:

 1. Shall have a lien on all funds recovered in connection to the loss *to the extent of its payment* \*\*\*." (Emphasis added.)

The conflict arises as a result of the parties' differing views on whether the capitation payments PersonalCare made to Covenant and Christie constitute "payments" in the context of the agreement.

Defendants admit that PersonalCare pays Covenant a monthly capitation payment of $347,237.61 in return for medical services for PersonalCare members. They contend that because PersonalCare would have made this payment even if Jerry had not received any treatment, it did not constitute a "payment" for Jerry's medical services.

The hospitals clearly provided medical services to Jerry; it is equally obvious that those services were not cost-free. The hospitals collectively allocated $377,582.92 of the capitation amounts they received from PersonalCare toward Jerry's treatment by making an accounting entry. Only an accounting entry was required because of the contractual relationship between PersonalCare and the hospitals through which the hospitals provided medical treatment to Personal-Care members in return for unallocated payments made by Personal-Care to the hospitals. The capitation payments obviously cannot be allocated until the hospital actually provides medical services to Per-sonalCare members. Accordingly, the accounting transfer is a valid reflection of the amount of reasonable and customary medical expen-ses "paid" by PersonalCare to the hospitals for Jerry's treatment.

Moreover, defendants admit that PersonalCare has a right to claim reimbursement for expenses Jerry incurred from medical providers with whom PersonalCare has no contractual relationship. (PersonalCare made payments of $173,160.62 to healthcare providers other than Christie and Covenant with whom it did not have contracts.) In that case, the allocation to the member preceded the payment. We see no significant difference between these two methods of paying for health care. Thus, we conclude that PersonalCare's pay-ments to Covenant and Christie constitute "payments" subject to recoupment. Accordingly, we hold that the trial court did not err by failing to reduce the damage award, pursuant to section 2—1205.1 of the Procedural Code.

The material in section VII is not to be published pursuant to Rule 23 (166 Ill. 2d R. 23).

## VIII. CONCLUSION

For the reasons stated, we affirm in part and reverse in part, as follows: (1) we affirm the judgments in favor of plaintiffs and against

defendants; (2) we reverse the trial court's denial of plaintiffs' motion for judgment *n.o.v.* regarding Jerry's alleged comparative negligence, and accordingly, we vacate the reduction of the damages based on comparative negligence. With regard to defendants' cross-appeal, we (1) reverse the trial court's ruling denying the reduction of count III's damages for funeral and memorial expenses that were included in count I; and (2) grant defendants' request to correct the damages award to conform to the trial court's previous ruling reducing the damages award for count I by the medicare and public aid payments.

Affirmed in part, vacated in part, reversed in part, and remanded with directions.

KNECHT and GREEN, JJ., concur.