1-99-3099

RICHARD GOLDBERG,       ) Appeal From The

) Circuit Court

Plaintiff-Appellee, ) Of Cook County

)

)

)

THE DEPARTMENT OF PROFESSIONAL )

REGULATION; NIKKI ZOLLAR, Director, PATRICIA )

L. DANIELS, Acting Director; and the MEDICAL )

DISCIPLINARY BOARD, ) Honorable

) Sidney A. Jones, III

Defendants-Appellants. ) Judge Presiding

)

JUSTICE REID delivered the opinion of the court:

This appeal flows from entry by the circuit court of Cook County of an order reversing the final administrative decision of the Acting Director of the Illinois Department of Professional Regulations (IDPR) to reprimand the medical license of Dr. Richard Goldberg.

                                                                THE FACTS

On July 25, 1988, the IDPR filed a complaint against Dr. Goldberg, a psychiatrist licensed to practice in the State of Illinois.  The complaint alleged that he committed acts of misconduct while treating Carolyn B. for an eating disorder and depression.  The IDPR deemed these acts grounds for revocation of his medical license under sections 22(A)(4), (A)(5), and (A)(20) of the Medical Practice Act of 1987, (Medical Practice Act)  (225 ILCS 60/22(A)(4), (A)(5), (A)(20) (West 1998)).  The IDPR originally sought to have Dr. Goldberg’s license revoked, suspended or otherwise disciplined.  The complaint was answered by Dr. Goldberg on September 9, 1988.

An administrative hearing was convened on December 5, 1988.  The IDPR called as witnesses Carolyn B., Dr. Goldberg as a hostile witness, IDPR Investigator Judith Johnson, and Dr. Judith Davis, as both an expert witness and a psychiatrist who treated Carolyn B. after Dr. Goldberg.  At the end of these witnesses’ testimony, the matter was stayed for approximately nine years while Dr. Goldberg sued Dr. Davis to turn over medical records in her possession.  The litigation between Dr. Goldberg and Dr. Davis was appealed to this court and, ultimately, to the Illinois Supreme Court.  The matter was remanded back to the circuit court  for an 
in camera
 inspection of the records.  After reviewing the records, the circuit court released them.  On August 26, 1997, the hearing recommenced before a different hearing officer.  Dr. Goldberg called six witnesses, including himself.  Also testifying were character witnesses Dr. Edward Goldberg, Joyce Washington, Dr. Samuel Libert, and Dr. Peter Giovacchini.  Dr. Edward Wolpert testified as an expert witness.  Dr. Goldberg began treating Carolyn B in June 1987.  At that time, he had been a licensed psychiatrist in the State of Illinois for approximately nine years.  He diagnosed Carolyn B. with bulimia, borderline personality disorder and dental problems secondary to bulimia.  He noted that her history contained some periods of indiscriminate sexual activity.  According to Dr. Goldberg, Carolyn B. reported performing sexual favors for her previous psychiatrist in exchange for gifts or loans of money.  During treatment she confessed a strong attachment to Dr. Goldberg.  She also believed that he returned her feelings, which in her opinion were genuine.  

During the treatment, Carolyn B. stated that Dr. Goldberg did not know what it was like to binge on food.  Dr. Goldberg suggested that she show him.  He claims the two arranged for him to be present at her apartment when she binged and subsequently purged.  On October 16, 1987, Dr. Goldberg went to her apartment.  He watched her eat quantities of ice cream, corn chips, and maple syrup.  Then he watched her vomit.  

Dr. Goldberg acknowledged that he had treated other patients with bulimia, but never went to their homes.  He also testified that he did not watch any of his other bulimic patients eat or vomit as part of their treatment.  He admitted there was another patient whose home he went to for a therapeutic session.  He claimed he went to Carolyn B’s house to observe her claimed numbness or altered state of being when she binged.  He felt this might be indicative of a hypnoid or dissociative state, which he believed could not be properly observed any other way.

In a session on October 20, 1987, Carolyn B. told Dr. Goldberg that she would do anything he wanted for money and was very aroused when he hugged her.  Carolyn B. claimed she could feel that he would get aroused during the hugs.  He responded that he did not have sex with his patients.  He also responded that this is why he did not like the idea of hugging his patients, in that it would ultimately be unsatisfying for her.  Dr. Goldberg claims that Carolyn B.’s attraction for him became so intense that he had to turn her over to another therapist.

On the evening of October 22, 1987, Carolyn B. paged Dr. Goldberg while he was dining with colleagues.  When he called her, she indicated that she was unhappy with the referrals and needed to see him right away.  She claims she suggested meeting at his office, but that he did not want to do that.  According to Carolyn B., Dr. Goldberg offered to meet in the lobby of her building to talk for a few minutes.  When he arrived, he parked in a loading zone.  Since the building would not allow him to remain parked there, Carolyn B. got into the car and they drove around looking for a place to park.  They parked on a street within Lincoln Park, where they remained for 30 to 60 minutes.  

Carolyn B. testified they talked about her consultations with the other doctors.  She claims he told her that he was the doctor who could help her better than anyone else.  Carolyn B. claims she protested that she was too attracted to him to be treated by him.  She also claims she asked Dr. Goldberg if they could be just friends, at which time he leaned in and french-kissed her.  Carolyn B. claims she told him she wanted to physically demonstrate her affection and desire for him.  He declined, supposedly responding that he would be putting not only his career on the line but his life as well.  

On October 23, 1987, Carolyn B. claims she and Dr. Goldberg went to one of his offices for sexual purposes.  During this encounter, Carolyn B. claims they engaged in mutual acts of oral copulation.  When they tried to have intercourse, she claims he lost his erection.  Dr. Goldberg denies having sex with Carolyn B.  

Judith Johnson testified that Dr. Goldberg characterized his visit to Carolyn B’s home as a research project.  Dr. Goldberg denied the existence of any research project related to what he was doing with Carolyn B.  Johnson testified to her understanding of what took place in Carolyn B’s apartment.  Johnson claimed that Dr. Goldberg went to the patient’s home, spoon-fed her ice cream and other food, then watched her vomit.  Dr. Goldberg denied that he spoon-fed the ice cream, claiming he was there to observe her actions and mental state during a binge.  

Dr. Judith Davis testified that, in her opinion, Carolyn B. had developed an erotic transference to Dr. Goldberg.  Dr. Davis acknowledged that, when the wishes of patients with character disorders are not met, either because their expectations are unrealistic or the failure of the object of their affection to respond as they desire, they can experience massive feelings of rage.  Dr. Davis also testified that, in her professional opinion, bulimia does not require a patient to eat and vomit in a therapist’s presence.  In all the time Dr. Davis treated Carolyn B., she never made her eat just to watch her vomit.  Although Dr. Davis admitted that more seriously ill patients sometimes require home visits, she did not feel Carolyn B. was such a patient.  Dr. Davis also testified that she saw no point in watching someone eat and vomit.  Dr. Davis also testified that picking up a patient in the car and driving and parking with her is inappropriate and violated professional standards in so doing.  On cross-examination, Dr. Davis confessed that she had limited experience in treating patients with disorders similar to Carolyn B.  Dr. Davis admitted that she was only trained in the psychiatric modality of psychoanalysis.  Her familiarity with eating disorders was also limited, as she admitted to reading a number of professional articles and “psychiatric updates.”  Cross-examination also got Dr. Davis to admit that she was basically not familiar with professional literature in the area of psychiatric home visits.  While she was familiar with literature in the area of personality disorders and borderline mental states, Dr. Davis admitted to taking no post-graduate training in the area, other than her work at the Psychoanalytic Institute.  Further cross-examination revealed that Dr. Davis never requested Dr. Goldberg’s record of the treatment, instead relying exclusively on Carolyn B’s version of events.  Clearly, Dr. Davis believed Carolyn B.’s version of the events during her treatment by Dr. Goldberg.

Carolyn B. next testified that she and Dr. Goldberg had discussed his making a home visit.  They also discussed her attraction for him which she found frustrating.  At the time she made arrangements with Dr. Goldberg to come to her home, Carolyn B. testified she still had her feelings of attraction.  

Dr. Wolpert next testified as an expert for Dr. Goldberg.  He testified that the home visit was not unprofessional, though it was a dangerous thing to do.  He also felt that Carolyn B. had “trapped” Dr. Goldberg into making the home visit.  

Dr. Edward Goldberg next testified.  He is not related to Dr. Richard Goldberg.  He is the hospital administrator at two facilities who has become familiar with Dr. Goldberg’s reputation.  He testified he believes Dr. Goldberg has solid professionalism and responsiveness.  Any feedback Dr. Edward Goldberg received about Dr. Goldberg was positive.  Also testifying as positive character witnesses for Dr. Goldberg were Joyce Washington, Dr. Samuel Libert and Dr. Peter Giovacchini.

The hearing officer issued his findings and recommendation with the Illinois State Medical Disciplinary Board (Disciplinary Board or Board) on March 11, 1998.  In that document, the hearing officer concluded that the Department had failed to prove its case against Dr. Goldberg by clear and convincing evidence.  The hearing officer found Dr. Goldberg to be more credible than Carolyn B. and concluded that the kissing and sexual episodes never took place.  The hearing officer also found convincing Dr. Wolpert’s expert testimony that Dr. Goldberg did not violate professional standards when he went to Carolyn B’s home to watch her binge and purge.  Accordingly, the hearing officer recommended that the charges against Dr. Goldberg be dropped and that his license remain unblemished and in good standing.

On May 6, 1998, the Disciplinary Board issued its findings of fact, conclusions of law and recommendation to the Director of the Department.  In that document, the Disciplinary Board disagreed in part with the hearing officer’s conclusions of law.  The Disciplinary Board agreed that the kissing and sexual episodes were not proven by clear and convincing evidence.  The Disciplinary Board noted that Dr. Goldberg had admitted that he met with Carolyn B. outside his office, went to her house and observed her binge and purge, and met with her another time in his car.  The Disciplinary Board found this to be clear and convincing evidence that he violated the Medical Practices Act.  The Disciplinary Board recommended to the Director that Dr. Goldberg’s medical license be reprimanded.

On May 20, 1998, Dr. Goldberg filed a request for a rehearing on that part of the Disciplinary Board’s recommendations which conflicted with those of the hearing officer.  On December 10, 1998, the request was denied and the Disciplinary Board’s recommendations were adopted by the Acting Director.  

Dr. Goldberg filed his complaint for administrative review and injunctive relief on January 5, 1999.  He asked the circuit court to reverse the Acting Director’s decision finding that he violated the Medical Practices Act and reprimanding his license.  The trial court granted an emergency stay.  The Department filed its response to the complaint for administrative review, including the record.  The Department later supplemented the record, at the request of Dr. Goldberg, with articles that had been offered into evidence at the administrative hearing but had been excluded as hearsay.  

On July 27, 1999, the trial court reversed the Acting Director’s decision to reprimand Dr. Goldberg’s medical license.  The trial court held that the Acting Director’s decision was arbitrary and unreasonable.  The trial court also held that Acting Director’s findings of fact  were against the manifest weight of the evidence and conclusions of law were legally erroneous.  The trial court also concluded that the hearing officer erred in excluding the articles proffered by Dr. Goldberg.  The trial court further found that Dr. Davis’ testimony was insufficient to support the Acting Director’s decision. 

The IDPR filed this appeal from the circuit court’s order, contending: (1)  that the Acting Director’s decision to reprimand Dr. Goldberg’s medical license was neither against the manifest weight of the evidence nor contrary to law; and (2) that it was not an abuse of the hearing officer’s discretion to exclude from evidence as hearsay various learned articles offered by Dr. Goldberg.  For the reasons that follow, we affirm the decision of the trial court.

                                                                 ANALYSIS

I

 “The Administrative Review Law provides that, in every action to review an administrative decision, ‛[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct.’” 
Terrano v. Retirement Board of the Policemen’s Annuity & Benefit Fund
, 315 Ill. App. 3d  270, 274 (2000), quoting 735 ILCS 5/3-110 (West 1998).  The decision of an administrative agency is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.  
Flaherty v.  Retirement Board of the Policemen’s Annuity & Benefit Fund
, 311 Ill. App. 3d  62, 65 (1999), citing 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d  76, 88 (1992).

“Courts have construed [the Administrative Review Law] to mean that, on administrative review, it is not a court’s function to reweigh the evidence or make an independent determination of the facts.  Rather, the court’s function is to ascertain whether the findings and decision of the agency are against the manifest weight of the evidence.” 
Abrahamson
, 153 Ill. 2d  at 88, citing 
Murdy v. Edgar
, 103 Ill. 2d  384, 391 (1984), 
Davern v. Civil Service Comm’n
, 47 Ill. 2d  469, 471 (1970), and 
Middleton v. Clayton
, 128 Ill. App. 3d  623, 630 (1984).  “The [hearing officer’s] conclusions of fact are to be accepted on review unless the opposite conclusion is clearly evident.”  
Mason v. Department of Public Health
, 326 Ill. App. 3d  616, 622 (2001), citing 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d  191, 205 (1998).

“An administrative agency’s conclusions of law *** are afforded less deference [than its findings of fact] and are reviewed on a 
de novo
 basis.  [Citation.]  When the agency’s determination involves a mixed question of fact and law, the applicable standard of review is the 
clearly erroneous
 standard, which falls between a manifest weight of the evidence standard and  
de novo
 review, so as to give some deference to the agency’s experience and expertise.”  (Emphasis added.)  
Swoope v. Retirement Board of the Policemen’s Annuity & Benefit Fund
, 323 Ill. App. 3d  526, 529 (2001), citing 
City of Belvidere
, 181 Ill. 2d  at 205.  

Section 22(A) of the Medical Practice Act provides a list of grounds upon which a decision may be based to revoke, suspend or otherwise discipline a medical license.  225 ILCS 60/22(A) (West 1998).  Of those promulgated grounds, the IDPR sought to penalize Dr. Goldberg for violations of the following subsections:

(A)  The Department may revoke, suspend, place on probationary status, or take any other disciplinary action as the Department may deem proper with regard to the license or visiting professor permit of any person issued under this Act to practice medicine, or to treat human ailments without the use of drugs and without operative surgery upon any of the following grounds:

* * *

(4) Gross negligence in practice under this Act.

(5) Engaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public.

* * * 

(20) Immoral conduct in the commission of any act including, but not limited to, commission of an act of sexual misconduct related to the licensee’s practice."  225 ILCS 60/22(A) (West 1998). 

The IDPR, under the aegis of the Illinois legislature and with the recommendation of the Disciplinary Board, has adopted rules to define the conduct which runs afoul of the above- identified statutory language.  Dishonorable, unethical and unprofessional conduct, in this context,  have been defined in the Illinois Administrative Code.  See 6
8 Ill. Adm. Code §1285.240(a) (2002).

“In determining what constitutes dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public, the Disciplinary Board shall consider whether the questioned activities:

A) Are violative of ethical standards of the profession (such as safeguard patient confidence and records within the constraints of the law; respect the rights of patients, colleagues and other health professionals; observe laws under the Act and pertaining to any relevant speciality; to provide service with compassion and respect for human dignity).

B) Constitutes a breach of the physician’s responsibility to a patient;

C) Resulted in assumption by the physician of responsibility for delivery of patient care which the physician was not properly qualified or competent to render; 

D) Resulted in a delegation of responsibility for delivery of patient care to persons who were not properly supervised, or who were not competent to assume such responsibility;

E) Caused actual harm to any member of the public; or

F) Are reasonably likely to cause harm to any member of the public in the future.”  68 Ill. Adm. Code §1285.240(a)(1) (2002).

Hearing officer Daniel P. O’Sullivan concluded that the Department failed to prove its complaint against Dr. Goldberg by clear and convincing evidence.  He found Dr. Goldberg to be credible and Carolyn B. to be seriously mentally ill, hostile and angry toward males in general and quick to point an accusatory finger.  Hearing officer O’Sullivan concluded that the kissing and sexual episodes never took place.  He also concluded that, while Dr. Goldberg admitted to going to Carolyn B’s apartment, expert testimony convincingly showed that the conduct did not breach the psychiatric standards at the time.  O’Sullivan further concluded that, in the time between the start of the administrative hearing and the conclusion, there had been no other complaints against Dr. Goldberg in almost nine years.  His recommendation to the Disciplinary Board was that the entire matter be dismissed and that Dr. Goldberg’s license remain in good standing.  

In its findings of fact, conclusions of law and recommendation to the director of the  Disciplinary Board, the Board adopted 
in toto
 the findings of fact of the hearing officer.  
The Board then disagreed in part with the hearing officer’s conclusions of law.  While it agreed that the sexual and kissing episodes never took place, the Board concluded that the remaining accusations were proven by clear and convincing evidence.  Specifically, the Board concluded that expert testimony showed that, in going to Carolyn B’s home and allowing her into his car to talk, Dr. Goldberg’s conduct violated the Medical Practice Act.  We disagree.  

Without the allegations of sexual misconduct at the heart of the complaint against Dr. Goldberg, all that remains are allegations that he conducted a home visit to view a patient’s mental state in her home environment during an incident of bulimia and that he had an hour-long, nonsexual episode of conversation with an arguably distraught patient in his car on a public roadway.  

The hearing officer’s findings and conclusions are based on his review of all the expert testimony, some that he found convincing and some that he did not.  The finding that the sexual and kissing episodes did not occur, a finding that the Board endorsed wholeheartedly, seriously undercut the expert testimony of Dr. Davis. Dr. Davis' testimony and conclusions were predicated on her belief that there was sexual contact involved in Dr. Goldberg’s treatment of Carolyn B.  The hearing officer’s findings and conclusions show 
sub silencio
 that he found compelling the expert testimony presented by Dr. Goldberg’s witnesses.  T
he hearing officer mentioned with specificity Dr. Edward Wolpert’s testimony that Dr. Goldberg did not breach psychiatric standards of care in his treatment.  For the Acting Director to have adopted the findings of fact and conclusion that no sex took place between this doctor and this patient, all the while rejecting the remainder of the hearing officer’s conclusions, is a clearly erroneous result.  

To accept the Disciplinary Board’s result, we would be forced to say that a home visit conducted for therapeutic purposes, which most of the experts in this case acknowledged that certain doctors do, was gross negligence as defined in the Medical Practice Act, namely, dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public.  We would also be forced to accept that such a home visit was immoral conduct equivalent to commission of an act of sexual misconduct related to the licensee’s practice.  As for the remaining charge, that Dr. Goldberg allowed a patient in his car to sit and talk, we simply cannot agree with the conclusion that such conduct is sanctionable.  Since it is clear to all that no sex took place whatsoever, Carolyn B. was put in no danger by Dr. Goldberg’s actions.  We decline to extend the definition of dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public to this doctor on these facts.  As for the home visit, for the IDPR to sanction Dr. Goldberg amounts to punishing a physician for conduct which not only has been done by other doctors, but that has been recognized as a legitimate therapeutic technique in certain medical texts and treatises.  

On appeal, the Department has conceded that it proceeded only under the theory that Dr. Goldberg's conduct was likely to harm the public. The facts, as found by the hearing officer, demonstrate that the actions of Dr. Goldberg did not create a situation that was likely to harm the public.  As such, the decision of the trial court to reverse the decision of the Acting Director must be affirmed.

II

We briefly move on to Dr. Goldberg’s remaining claim before the trial court, that the hearing officer abused his discretion by excluding from admission into evidence as hearsay various professional articles.  These articles, too numerous to list individually, dealt with anorexia nervosa, bulimia nervosa , the value of and or detriment from touch in psychotherapy, adolescent psychiatry and its approach to anorexia and bulimia nervosa, eating and psychotherapy, and cognitive and behavioral treatment of bulimia nervosa.  Dr. Goldberg argues that the articles in question were used as study aids on the subjects of bulimia and borderline personality disorder and were not used for hearsay purposes.  Dr. Goldberg argues that he should have been permitted to present proof of the information he used to reach his conclusions that his treatment protocols are permitted.  He argues they would not tend to show, the truth of the matter asserted but, rather, their publication demonstrates that he is not the only one to subscribe to the theories contained therein
(footnote: 1).  The IDPR responds that the articles are hearsay and were properly excluded because it is not possible to cross-examine the authors.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.  
People v. Heard
, 187 Ill. 2d  36, 65 (1999), citing 
People v. Albanese
, 102 Ill. 2d  54, 70 (1984).  A party is generally prohibited from introducing medical treatises as substantive evidence.  
Costa v. Dresser Industries, Inc.
, 268 Ill. App. 3d  1, 11 (1994); see 
Fornoff v. Parke Davis & Co
., 105 Ill. App. 3d  681 (1982).  The trial court’s determination of admissibility of evidence lies within its sound discretion.  
Frank v. Edward Hines Lumber Co.
, 327 Ill. App. 3d  113, 121 (2001), citing 
First Midwest Trust Co. v. Rogers
, 296 Ill. App. 3d  416, 426 (1998).  A reviewing court will not reverse the trial court’s decision absent an abuse of that discretion.  
Carillo v. Ford Motor Co.
, 325 Ill. App. 3d  955, 966 (2001), citing 
First Midwest
, 296 Ill. App. 3d  at 426.  

The trial court found that the learned articles were not hearsay.  Even if they were hearsay, the trial court found they would be admissible because of their circumstantial guarantees of trustworthiness and because their probative value outweighed any prejudice that might flow from the authors not being available for cross-examination.    We agree.  “In addition to any other exceptions to the hearsay rule which exists in Illinois, a statement may be admitted if it has circumstantial guarantees of trustworthiness, and if the probative value of the statement outweighs any prejudice resulting from an inability to cross-examine the declarant.”  68 Ill. Adm. Code §1110.220(b) (2002).  

The articles were not offered to prove the truth of the matter asserted but, rather, to show that Dr. Goldberg’s state of mind could reasonably have been affected by reading them.  As a result, Dr. Goldberg reasonably believed the conduct mentioned in the articles was permitted.  The existence of articles would also tend to support his conduct, because medical literature is one way doctors learn of changes in medical standards.  Those articles would also be admissible for the limited purpose of establishing the basis of Dr. Goldberg’s professional opinion, if not his professional judgment.  

CONCLUSION

In light of the foregoing, the judgment of the trial court is affirmed.

Affirmed.

FOOTNOTES
1:  The articles sought by Dr. Goldberg to be admitted into evidence were published in various texts, treatises and periodicals during the early to mid 1980's.  The publication dates of these articles predate the conduct of Dr. Goldberg which is at issue in this cause and could, therefore, have been relied upon by Dr. Goldberg, contributing to his state of mind when deciding upon the treatment protocols to be followed with Carolyn B.