LINDSAY DURAN, a Minor, by her Mother and Next Friend, Ellen Duran, *et al.*, Plaintiffs-Appellants, v. JOHN P. CULLINAN *et al.*, Defendants-Appellees.

Second District    No. 2—96—0299

Opinion filed March 17, 1997.

David A. Novoselsky and Linda A. Bryceland, both of David A. Novoselsky & Associates, of Chicago, and Thomas H. Bleakley, of Bleakley & McKeen, P.C., of Detroit, Michigan, for appellants.

William V. Johnson, Thomas J. Koch, Ann M. Smith, Thomas H. Fegan, and Kelly N. Warnick, all of Johnson & Bell, Ltd., of Chicago, for appellees.

JUSTICE THOMAS delivered the opinion of the court:

The plaintiffs, Lindsay Duran, by her mother, Ellen Duran, Ellen Duran, individually, and Joseph Duran, brought this medical malpractice action against the defendants, Dr. John P. Cullinan, Dr. Alan M. Haan, and the Oswego Medical Group, to recover damages for injuries to Lindsay allegedly caused by the defendants' prescription of Ovulen-21, a birth control pill, while Ellen was pregnant with Lindsay. The trial court granted the defendants' motion for summary judgment, finding that the plaintiffs' experts' conclusions as to causa-

tion were inadmissible under the standard enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

The record reveals that Lindsay was born on December 2, 1983, with multiple birth defects including mental retardation; hearing, speech, and vision impairments; developmental delay; and facial dysmorphic features (*i.e.*, bilateral blepharophimosis and unilateral nystagmus). Ellen had previously given birth to two other children who had birth defects.

On March 29, 1983, Ellen went to the Oswego Medical Group to see her gynecologist, Dr. Cullinan, suspecting that she might be pregnant. However, Ellen was instead seen by Dr. Haan, a family practitioner. Dr. Haan conducted a Gravindex pregnancy test and a physical examination. Neither the test nor the examination showed any indication that Ellen was pregnant. However, that particular test given in conjunction with a physical exam was not sufficient to rule out the possibility of pregnancy. Dr. Haan then prescribed Ovulen-21, an oral contraceptive, and directed Ellen to begin taking the drug. At that time, Ellen had been pregnant for approximately 27 days. Thereafter, she took one cycle of the birth control pills before discovering that she was pregnant.

On July 10, 1992, the plaintiffs filed the present lawsuit after voluntarily dismissing their original suit. The plaintiffs attached to their amended complaint the affidavit of Dr. Michael L. Berke, a specialist in obstetrics and gynecology. Dr. Berke stated that it was his opinion that the defendants breached the standard of care by failing to adequately rule out pregnancy and by prescribing birth control pills to a woman they should have known was pregnant. Dr. Berke further opined that the defendants' acts or omissions caused Lindsay's birth defects.

Dr. Paul Wong, board certified in pediatrics and medical genetics, stated in his deposition that he had been Lindsay's treating physician. He testified with a reasonable degree of medical certainty that Ovulen-21 did not cause Lindsay's birth abnormalities. He based his opinion on the absence of medical literature linking Ovulen-21 to the types of birth defects suffered by Lindsay. He further testified that it was significant that Lindsay had two siblings with birth defects and that she may have inherited a genetic disorder from her parents.

Dr. Joe Hoo, an expert in medical genetics, who was also one of Lindsay's treating physicians, testified in his deposition that Lindsay's birth defects were probably not caused by birth control pills. He stated that he was not aware of any link between Ovulen-21 and the type of birth defects suffered by Lindsay. Although he could not determine the cause of Lindsay's condition, Dr. Hoo stated that the cause could have been genetic.

Dr. Eugene Pergament, board certified in clinical genetics and cytogenetics, testified that he has access to the most recent scientific literature and medical opinion regarding the teratogenic impact of various agents. He noted that prior to his deposition he checked the data bases for information on whether the chemical agents that comprise Ovulen-21 are capable of causing the type of birth defects evinced by Lindsay. He testified that there is no teratogenic risk to children from exposure to the chemical agents comprising Ovulen-21.

Dr. Melvyn Bayly, an obstetrician and gynecologist, testified that, based on his review of the literature and his experience, Lindsay's birth defects were not caused by Ellen's ingestion of birth control pills during pregnancy. He expressed his opinion that Ellen's history of having children with abnormalities was more significant than the ingestion of Ovulen-21 in determining the cause of the defects.

In the course of the litigation, the defendants filed amended interrogatories pursuant to Supreme Court Rule 220 (134 Ill. 2d R. 220), requesting that the plaintiffs disclose the experts they expected to call at trial, the nature of their opinions, and the underlying bases for those opinions. In response, the plaintiffs identified their experts and submitted essays of each expert. The essays were nearly identical in content. They briefly described the time frame of Ellen's pregnancy and the ingestion of contraceptives, the ordinary development of the nervous system during pregnancy, and a Federal Drug Administration (FDA) rule promulgated in 1977 requiring patient warnings with progestational agents. The essays then stated that "[a]dditional supporting data for the causal connection between oral contraceptives and this unfortunate child's birth defects are extrapolated from a wide variety of defects appearing in the literature." The remainder of each essay consisted of general descriptions of 43 different studies identified by the author's last name and the year the study appeared in print. Some of the types of birth defects identified by the various studies included central nervous system defects, including memingomyelocele or hydrocephalus; anencephaly; spina bifida; neural tube defects; neurological disorders; cardiovascular defects; cardiac anomalies; VACTEL syndrome (vertebral, anal, cardiac tracheal, esophagal, and limb defects), osseous abnormalities; micrognathia; cleft palate; and dysmorphic features, including growth retardation, mental retardation, peculiar facies, umbilical eversion, sacral pit, and hypospadias (Lorber study). The essay concluded by additionally noting that animal studies indicate that oral contraceptives have significant teratogenic potential.

The defendants filed a motion to strike the plaintiffs' answers to

their interrogatories and a motion for summary judgment. Substantively, the defendants contended that the opinions of the plaintiffs' eight experts lacked sufficient foundation for admissibility. The defendants argued that the "extrapolation" method used by the plaintiffs' experts in reaching their opinions on causation was not generally accepted in the scientific community as is required by *Frye*, 293 F. at 1014. In support of their motion, the defendants attached the affidavit of Dr. Thomas Shepherd, a board-certified pediatrician with expertise in teratology, who opined with a reasonable degree of medical certainty that Ovulen-21 did not cause the birth defects exhibited by Lindsay. He further opined that the plaintiffs' experts' attempts to "reevaluate" the scientific articles "to support plaintiffs' experts' opinions concerning a causal relationship between Ovulen 21 and [Lindsay's] birth defects would be contrary to accepted scientific principles and methodologies used by the scientific community to determine a causal relationship between a potential teratogen on human fetal development."

The plaintiffs filed a response to the defendants' motion for summary judgment, attaching the affidavit of Stuart A. Newman, Ph.D., a professor of biology and anatomy with expertise in teratology and embryology. Dr. Newman stated that he was familiar with the methodology scientists employ in determining probable relationships between exposure to drugs, such as oral contraceptives, and abnormalities of fetal development. In his opinion, the methodologies used by the plaintiffs' experts in their answers to the interrogatories "are commonly used not only by the scientific community but the FDA, the EPA, and numerous other governmental agencies such as the National Institute of Health (NIH) to assess probable relationships between potential teratogens and human fetal development."

Based on the foregoing pleadings, depositions, and affidavits, the trial court granted the defendants' motion for summary judgment. In its written opinion explaining its decision, the court noted that no study specifically showed Ovulen-21 to cause birth defects of the type found in Lindsay. Rather, the plaintiffs' experts had relied on some 43-odd epidemiological studies involving birth defects not of the type found in Lindsay. The court then stated that the plaintiffs' experts' opinions did not rest on the 43 studies directly, but on "extrapolation" from them, and thus the general acceptance of the "extrapolation" technique must be tested under *Frye*. The court then concluded that, because the plaintiffs' methodology in reaching their conclusion was not generally accepted in the scientific community, a genuine issue of material fact did not exist and therefore summary judgment was appropriate. In reaching its conclusion, the court relied upon the fact that the plaintiffs' methodology was not peer reviewed.

On appeal, the plaintiffs argue that the trial court abused its discretion in granting the defendants' motion for summary judgment. Specifically, the plaintiffs contend that the methodology employed by their experts in arriving at the opinion as to the cause of Lindsay's injuries complied with the *Frye* standard.

■ Initially, we note that summary judgment is a drastic means of disposing of litigation and should be employed only when the right of the moving party is clear and free from doubt. *Mitchell v. Jewel Food Stores*, 142 Ill. 2d 152, 165 (1990). However, summary judgment is proper when the pleadings, depositions, and affidavits on file demonstrate that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1994).

■ In order to prove a case of medical negligence, the plaintiff must establish: (1) the standard of care against which the medical professional's conduct must be measured; (2) a negligent failure to comply with that standard; and (3) that the injury for which the suit is brought had as one of its proximate causes the negligence of the professional. *Saxton v. Toole*, 240 Ill. App. 3d 204, 210 (1992). Because jurors are not skilled in the practice of medicine, the plaintiff must present expert testimony to establish, within a reasonable degree of medical certainty, that an act of the defendant caused the plaintiff's injuries. *Saxton*, 240 Ill. App. 3d at 210. As a court reviewing the propriety of an order granting summary judgment, we conduct a *de novo* review. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). However, the threshold question of whether to admit scientific evidence under the test set forth in *Frye* lies within the sound discretion of the trial court. *People v. Acri*, 277 Ill. App. 3d 1030, 1033 (1996). But *cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1130 (9th Cir. 1991) (where court applied *de novo* review standard), *vacated on other grounds*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).

■ The admission of scientific evidence in Illinois is governed by the test set forth in *Frye*. *People v. Eyler*, 133 Ill. 2d 173, 211 (1989). Under the *Frye* test, evidence may be admitted when the scientific principle on which it rests has gained general acceptance in its particular field. The oft-quoted language from *Frye* is as follows:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction*

*is made must be sufficiently established to have gained general ac-
ceptance in the particular field in which it belongs."* (Emphasis
added.) *Frye*, 293 F. at 1014.

The plaintiffs argue that *Wilson v. Clark*, 84 Ill. 2d 186 (1981), in
which our supreme court adopted Rule 703 of the Federal Rules of
Evidence, somehow supports their position. However, the plaintiffs'
reliance on that authority begs the question at issue in this case.
That an expert may disclose the content of materials he reasonably
relied upon in reaching his conclusion has no bearing on the present
issue of whether the plaintiffs' methodology of extrapolating from
the scientific materials is generally accepted in the scientific com-
munity under *Frye*.

We agree with the trial court that the principal issue at stake
here is the scientific community's general acceptance of the
extrapolation technique employed by the plaintiffs' experts. However,
we disagree with the trial court's application of the *Frye* standard in
resolving the issue.

In reaching its decision to grant the defendants' motion for sum-
mary judgment, the trial court relied primarily on *Daubert*, 951 F.2d
1128, a case decided by the United States Court of Appeals for the
Ninth Circuit. There, the plaintiffs sued·a pharmaceutical company
to recover for limb-reduction birth defects allegedly sustained as a
result of a mother's ingestion of the antinausea drug Benedictin.
The company moved for summary judgment, submitting the support-
ing affidavit of an expert to the effect that no epidemiological study
had demonstrated a statistically significant association between Bene-
dictin and birth defects. In response, in order to establish causation,
the plaintiffs presented animal studies, chemical structure analyses,
and reanalyses or recalculations of previously published epidemiologi-
cal studies. The court of appeals found that the plaintiffs' experts'
reanalyses of the epidemiological studies were not generally accepted
in the scientific community. The court held that the animal and
chemical studies, together with the reanalyses of the epidemiological
studies, did not provide a sufficient foundation to allow the admission
of expert testimony to the effect that Benedictin caused the plaintiffs'
injuries. In reaching its conclusion, the court noted that the
reanalyses were unpublished, not subjected to the normal peer review
process, and generated solely for use in litigation.

The same results were reached on similar facts in *Lynch v.
Merrell-National Laboratories*, 830 F.2d 1190 (1st Cir. 1987), *Brock v.
Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir. 1989), and
*Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823 (D.C. Cir. 1988).
From these cases, it is apparent Benedictin had been the subject of

extensive epidemiological study and none of those studies indicated that the drug had any teratogenic effect whatsoever.

■ In *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1534 (D.C. Cir. 1984), the court dealt with an issue on the "frontier of current medical and epidemiological inquiry," whether paraquat exposure caused pulmonary fibrosis. The court concluded that the plaintiffs' expert was properly allowed to offer his opinion on causation. The court noted:

> "[A] cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, *** [the] law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical." *Ferebee*, 736 F.2d at 1535-36.

■ In contrast to the *Daubert* line of cases, where studies showed that the drug at issue had no teratogenic effect, the instant plaintiffs rely on 43 studies showing oral contraceptives to have a teratogenic effect. Following the reasoning of *Ferebee*, we do not believe that the plaintiffs were required to present an epidemiological study showing the exact type of defect as long as the plaintiffs' experts' methodology in reaching their conclusions as to causation was sound. In reaching that conclusion, we note that some of the defects described in the scientific literature appear to be similar if not identical to Lindsay's congenital defects. For example, the Lorber study identifies growth retardation and mental retardation, two defects present in Lindsay, as being caused by the ingestion of the hormones found in oral contraceptives.

The defendants apparently do not challenge the notion that Ovulen-21 is for all intents and purposes properly categorized as a progestional that is essentially the same as those causing the defects in the studies. Rather, the defendants rely on the fact that the literature does not mention the exact defects suffered by Lindsay. The defendants maintain that the scientific community does not accept extrapolation from the studies to conclude that other defects are caused which are not mentioned in the literature and that this is so because the extrapolation method has not been peer reviewed. However, if, as the plaintiffs' expert's affidavit suggests, extrapolation is a technique commonly used by the scientific community, it does not appear that the extrapolation method would be a likely subject for a scientific article. Similarly, the defendants would not be able to point to a scientific article discussing the dangers of extrapolation.

Thus, we are left with the parties' two competing affidavits as to the method's general acceptance. Taking as true the plaintiffs' expert's affidavit asserting that the extrapolation method is commonly used by the scientific community as well as various federal agencies, taken along with the similarity between some of the defects described in the scientific literature and those exhibited by Lindsay, we find that the trial court abused its discretion in finding that the plaintiffs' extrapolation from the studies was not a technique sufficiently established to have gained general acceptance in this particular scientific field. Thus, we conclude that the plaintiffs' experts may give their opinion as to causation and the weight to be afforded those opinions are matters for the jury to resolve. Under the circumstances of the case at bar, the fact that plaintiffs' experts had to "extrapolate" from various studies in arriving at their opinion rather than rely on a specific epidemiological study affects the weight of the testimony and not its admissibility. Accordingly, we hold that the trial court erred in granting the defendants' motion for summary judgment.

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

McLAREN and RATHJE, JJ., concur.