FRANCIS PATRICK HARRIS *et al.*, Plaintiffs-Appellees, v. CROPMATE COMPANY, d/b/a The Richter Company, *et al.*, Defendants-Appellants.

Fourth District    No. 4—98—0269

Argued November 17, 1998.—Opinion filed January 26, 1999.

Richard C. Palmer, Ian J. McPheron, and H. Roderic Heard (argued), all of Wildman, Harrold, Allen & Dixon, of Chicago, and Robert J. Brown, of Wyatt, Tarrant & Combs, of Lexington, Kentucky, for appellants.

Forrest G. Keaton (argued), of Rammelkamp, Bradney, Kuster, Keaton, Fritsche & Lindsay, of Jacksonville, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In January 1996, plaintiffs, Francis Patrick Harris and Linda N. Harris (the Harrises), sued defendants, Cropmate Company, d/b/a the Richter Company (Cropmate), and Robert Schone, one of Cropmate's employees, alleging that Cropmate and Schone had negligently sprayed a herbicide on farmland adjacent to a 50-acre tract of land rented and farmed by the Harrises, causing damage to the Harrises' watermelon, cantaloupe, and pumpkin crops. In October 1997, the trial court conducted a bench trial, granted a motion for directed verdict in Schone's favor, and ultimately entered judgment against Cropmate and in favor of the Harrises, awarding them damages.

Cropmate appeals, arguing that (1) the trial court erred by (a) refusing to admit a letter written by a bureau chief of the Illinois Department of Agriculture, (b) admitting the testimony of three of the Harrises' opinion witnesses, and (c) limiting the testimony of one of Cropmate's opinion witnesses; (2) the court's finding that the Harrises' crop yield loss resulted from Cropmate's negligent spraying of the herbicide 2,4-D was against the manifest weight of the evidence; and (3) the damages award was clearly excessive and against the manifest weight of the evidence. We affirm.

## I. BACKGROUND

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## II. ANALYSIS

### A. The Trial Court's Decision To Admit the Testimony of the Harrises' Opinion Witnesses

#### 1. The *Daubert* Standard

■ Initially, we address Cropmate's suggestion that this court should adopt the "admissibility standard for expert opinion" articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). We decline to do so.

Since the Supreme Court's decision in *Daubert*, the Supreme Court of Illinois has adhered to the "general acceptance" standard for the admission of novel scientific evidence established in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). See *People v. Hickey*, 178 Ill. 2d 256, 277, 687 N.E.2d 910, 920 (1997); *People v. Miller*, 173 Ill. 2d 167, 187, 670 N.E.2d 721, 731 (1996); *People v. Moore*, 171 Ill. 2d 74, 96, 662 N.E.2d 1215, 1225 (1996). In *Miller*, the court acknowledged

that the Supreme Court in *Daubert* held that the *Frye* "general acceptance" standard no longer applies in federal cases and, instead, Federal Rule of Evidence 702 (see 28 U.S.C. app. Fed. R. Evid. 702 (1994)) applies in those cases. Nonetheless, the *Miller* court declined to address *sua sponte* the issue of whether it should abandon the *Frye* standard and adopt the reasoning of *Daubert*. *Miller*, 173 Ill. 2d at 187 n.3, 670 N.E.2d at 731 n.3.

The decision whether to change long-standing, fundamental rules of Illinois evidence law lies within the discretion of the Supreme Court of Illinois, not this court. Further, even if we did possess that discretion, we are not at all sure *Daubert* should be adopted in this state—at least, not at the present. We note that legal scholars do not share Cropmate's enthusiasm regarding *Daubert*. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.4, at 565 (6th ed. 1994) (hereafter Handbook of Evidence) ("[M]any theoretical and practical arguments support Illinois retaining adherence to *Frye*, at least until the impact of *Daubert* is fully understood"); see also 2 M. Graham, Handbook of Federal Evidence § 702.5, at 34 (4th ed. Supp. 1999), in which Professor Michael H. Graham made the following comments:

> "*Daubert* boxed the courts into working within a structure that has not functioned as anticipated by the Supreme Court and can fairly be said not to have functioned well at all. The Supreme Court sought to encourage liberal admissibility. It believed that it was abolishing a strict *Frye* test in favor of a more liberal factor [-]balancing analyses [*sic*]. In fact, liberality of admissibility has not occurred ***."

## 2. Admissibility of the Opinion Testimony Under the *Frye* Standard

Cropmate alternatively argues that even if this court decides not to adopt the *Daubert* standard, the "proper application of th[e] *Frye* standard" would have precluded the testimony of Derrill Kregel, Aaron Hager, and Dr. Dennis Scott—the Harrises' three opinion witnesses. Specifically, Cropmate contends that no evidence exists that the "comparative symptomology" technique employed by those witnesses—that is, their visual examination of plants to determine whether they have suffered damage from exposure to 2,4-D—is generally accepted by the relevant scientific community. Because we conclude that the testimony at issue falls outside *Frye*'s scope, we disagree with Cropmate's contention.

Initially, we note that Cropmate never requested a *Frye* evidentiary hearing before the trial court. (Nor did Cropmate's motion to strike the testimony of Kregel and Scott—in which Cropmate argued *only* that the testimony should be excluded under the *Daubert* stan-

dard—request an evidentiary hearing.) Although Cropmate's failure to request such a hearing may well constitute a forfeiture of this issue on appeal, we nonetheless address Cropmate's argument on the merits. See *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 368, 695 N.E.2d 853, 858 (1998) (in general, the forfeiture doctrine is an admonition to the litigant, not a limitation on the jurisdiction of the reviewing court).

As earlier discussed, Illinois follows the *Frye* standard for the admission of "novel scientific evidence." *Miller*, 173 Ill. 2d at 187, 670 N.E.2d at 731. The *Frye* court explained the standard as follows:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

Professor Graham has written that imposing the *Frye* admissibility standard serves to accomplish the following:

"(1) ensure that a minimal reserve of experts exist who can critically examine the validity of a scientific determination in a particular case, (2) promote a degree of uniformity of decision, (3) avoid the interjection of a time[-]consuming and often misleading determination of the reliability of a scientific technique into the litigation, (4) assure that scientific evidence introduced will be reliable, [citation], and thus relevant, (5) provide a preliminary screening to protect against the natural inclination of the jury to assign significant weight to scientific techniques presented under circumstances where the trier of fact is in a poor position to place an accurate evaluation upon reliability, and (6) impose a threshold standard of reliability, in light of the fact that cross-examination by opposing counsel is unlikely to bring inaccuracies to the attention of the jury." Handbook of Evidence § 702.4, at 562.

See also J. Strong, *Questions Affecting the Admissibility of Scientific Evidence*, 1970 U. Ill. L.F. 1, 14 (the *Frye* standard seeks "prevention of the introduction into evidence of specious and unfounded scientific principles or conclusions based upon such principles").

In *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 427, 701 N.E.2d 1107, 1114 (1998), citing Handbook of Evidence § 702.4, at 562-63, this court, citing Professor Graham, recently discussed the application of the *Frye* standard and wrote the following:

"In applying the *Frye* standard, the trial court must determine

that (1) the scientific test is reliable; and (2) the test's reliability is generally accepted in the particular scientific field to which the test belongs."

Thus, following Professor Graham's lead, it appears that Illinois utilizes a *"Frye* plus reliability" standard for admission of "novel scientific evidence." See Handbook of Evidence § 702.4, at 559-63.

██ To assist trial courts in applying the *"Frye* plus reliability" standard, we recommend they use the following analytical framework, consisting of a series of inquiries to be raised in the order shown.

*First Inquiry***: Precisely what evidence is being proffered?** In this case, the Harrises proffered the testimony of Kregel, Hager, and Scott that exposure to 2,4-D had caused the injuries to the Harris crops, based upon their visual examination of the plants. In Scott's case, he based his opinion that 2,4-D had caused the injuries to the Harris crops, in part, on his visual examination of the videotape of the Harris field.

*Second Inquiry***: Will the proffered testimony assist the trier of fact to understand the evidence or determine facts in issue, or can the trier of fact use its own knowledge and experience?** See, for example, *People v. Enis*, 139 Ill. 2d 264, 289, 564 N.E.2d 1155, 1164-65 (1990) (in which the supreme court upheld the trial court's rejection of the defendant's proffered testimony regarding the reliability of eyewitness testimony because such testimony would not have aided the trier of fact in reaching its conclusion); *People v. Simpkins*, 297 Ill. App. 3d 668, 683, 697 N.E.2d 302, 311-12 (1998) (in which this court held that the trial court abused its discretion by allowing testimony regarding recantation by child victims of sexual abuse because such testimony (1) did not aid the jury in reaching its conclusion, and (2) severely impinged upon the province of the jury to determine credibility and assess the facts of the case). If the court determines that the testimony will not assist the trier of fact, that ends the inquiries regarding the proffered testimony, and the court should then reject it. In the present case, Cropmate does not contend on appeal that the causation testimony at issue would not have assisted the trier of fact.

*Third Inquiry***: If the trial court determines that the proffered testimony will assist the trier of fact to understand the evidence or determine facts in issue, then the court must ask, does the evidence constitute "science"—that is, does the proffered testimony constitute "scientific" evidence?** If the testimony does not constitute scientific evidence, then the *Frye* admissibility standard does not apply. Nonetheless, the trial court may still conduct a hearing into the reliability of the proffered testimony.

Although Illinois has not adopted the *Daubert* standard for admission of scientific opinion testimony, the Supreme Court's discussion regarding what constitutes "scientific knowledge" can still inform our analysis of what constitutes scientific opinion testimony. In *Daubert*, the Court noted that the words "scientific" and "knowledge," respectively, imply "a grounding in the methods and procedures of science" and "more than subjective belief or unsupported speculation." The Court added that to qualify as " 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590, 125 L. Ed. 2d at 481, 113 S. Ct. at 2795. Thus, in short, "a scientific expert is an expert who relies on the application of scientific principles, rather than on skill or experience-based observations, for the basis of his opinion." *Carmichael v. Samyang Tire Inc.*, 131 F.3d 1433, 1435 (11th Cir. 1997), *cert. granted sub nom. Kumho Tire Co. v. Carmichael*, 524 U.S. 936, 141 L. Ed. 2d 711, 118 S. Ct. 2339 (1998)· (on question of whether *Daubert* applies to admissibility of all expert testimony (see 66 U.S.L.W. 3723)). In *Berry v. City of Detroit*, 25 F.3d 1342, 1349-50 (6th Cir. 1994), the court explained this distinction as follows:

> "The distinction between scientific and non-scientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have." (Emphasis in original.)

Although the *Berry* court's beekeeper/aeronautical engineer comparison certainly provides insight into the distinction between a scientific expert and a nonscientific expert, it risks confusing the distinction between the trial court's questioning an expert's qualifications and the nature of an expert's testimony. Specifically, the *Berry* court noted that the beekeeper's testimony could be used to prove that bumblebees always take off into the wind, but the court did not address exactly what testimony the beekeeper could give to prove that proposition— that is, *how* he reached his conclusion regarding bumblebee flight pat-

terns. That should be the court's focus in determining whether an expert's testimony constitutes "scientific" opinion testimony.

Thus, the beekeeper may opine, based upon his many years of observing bees taking flight, that bees always take off into the wind. He may also state, "If the bees take off heading due west, you can be sure the wind is blowing from the west." The beekeeper may give those opinions because he reached those conclusions by combining only (1) his generalized knowledge of bees; (2) his firsthand observations of bees; and (3) the type of deductive process that is common to everyone. In reaching his conclusions, the beekeeper did not utilize some special scientific technique or method, such as by performing some sort of calculation based on general flight principles. On this point, see *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996), holding that the *Daubert* standard for admission of scientific evidence did not apply when the engineering testimony at issue was not based on any particular scientific methodology or technique but "upon general engineering principles and *** years of experience as an automotive engineer."

Even though the beekeeper's testimony relates to several fields of science, and even though a different expert may have reached the same conclusion using some specific, advanced scientific technique or method, the beekeeper's testimony escapes the *Frye* analysis because his opinion testimony represents nothing more than his experience and observations, combined with a deductive process familiar to the average trier of fact. Thus, the need for the trial court to "provide a preliminary screening to protect against the natural inclination of the jury to assign significant weight to scientific techniques" does not exist regarding the beekeeper. Simply because scientific principles *relate to* aspects of an opinion witness' testimony does not transform that testimony into "scientific" testimony. For example, in *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1041 (S.D.N.Y. 1995), the court held that forensic document examination expertise constituted "technical, or other specialized knowledge" under Rule 702, not "scientific knowledge," even though chemistry, physics, and mathematics clearly were implicated in the work of forensic document examiners. See also *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995) (*Daubert* II) (in which the ninth circuit, on remand from the Supreme Court, noted that "something doesn't become 'scientific knowledge' just because it's uttered by a scientist").

We stress that the beekeeper/aeronautical engineer comparison is intended to provide a helpful metaphor to assist trial courts in determining whether proffered opinion testimony constitutes "scientific" evidence. However, we do not mean to suggest that opinion

testimony is typically so easily classified into "scientific" and "nonscientific" evidence. Instead, the scientific/nonscientific dichotomy may best be viewed as a continuum, at one end of which the distinction between "scientific" and "nonscientific" evidence is clear, such as in the case of the beekeeper versus the aeronautical engineer. Moving down the continuum, the distinction begins to blur, and at the opposite end, no obvious clear demarcation exists between "scientific" and "nonscientific" evidence, such as in the case of a forensic document examiner, for example. See *Starzecpyzel*, 880 F. Supp. at 1041 (for a discussion of whether the testimony of forensic document examiners constitutes "scientific" evidence).

Here, botany and chemistry were undisputedly implicated in the testimony of Kregel (a seed salesman with several years' experience applying 2,4-D), Hager (an extension specialist and doctoral student in weed science who had read the literature and conducted field research on the effects of 2,4-D), and Scott (a research biologist who had become acquainted during the course of his work as an extension specialist with the effects of phenoxy-type herbicides, including 2,4-D, on cucurbits). However, none of these experts purported to have relied on some particular scientific principle or methodology to determine whether exposure to 2,4-D had caused the injuries to the Harris crops. (Unlike Dr. Thomas Monaco, one of Cropmate's opinion witnesses, who had performed a "calculation" to determine the concentration of 2,4-D that had drifted from a nearby field onto the Harris field.) Indeed, Kregel, Hager, and Scott all acknowledged that they did not know and had not calculated the minimum concentration of 2,4-D necessary to cause crop yield loss. Instead, akin to the beekeeper, Kregel, Hager, and Scott reached their conclusions that exposure to 2,4-D had caused the injuries to the Harris crops by combining (1) their generalized knowledge of agriculture, including crops and weeds; (2) their firsthand experience with and observations of the effects of exposure to 2,4-D upon cucurbits; and (3) the type of deductive process that is common to everyone.

Thus, we conclude that the causation testimony of Kregel, Hager, and Scott did not constitute "scientific" evidence. Accordingly, their opinion testimony fell outside the scope of *Frye*.

**Fourth Inquiry: If the trial court determines that the proffered testimony constitutes scientific evidence, then the court must ask, is that scientific evidence "novel," or does it involve instead a firmly established method or technique?** In making this determination, the court should ascertain whether any controlling precedent, which is on point, exists. See, for example, *People v. Campbell*, 146 Ill. 2d 363, 376-77, 586 N.E.2d 1261, 1267 (1992) (noting that

"correspondence of footprints found at the scene of a crime with the sole of one accused of the crime has long been admissible as competent evidence in an attempt to identify the accused as the guilty person"). If the scientific evidence is not "novel," then the *Frye* admissibility standard has been satisfied—that is, the scientific method or technique has been generally accepted in the relevant scientific community. However, as we earlier noted, the court still may conduct a hearing into the reliability of the proffered testimony.

In the present case, even assuming that the methods employed by the Harrises' opinion witnesses constituted scientific methods and thus fell within the realm of "scientific" evidence, we nonetheless conclude that these methods are not "novel." Neither Kregel, Hager, nor Scott purported to have relied upon some "[s]trikingly new, unusual, or different" (as the word "novel" is defined by the American Heritage Dictionary of the English Language 898 (1975)) method in reaching their opinions. In *People v. Sides*, 199 Ill. App. 3d 203, 206, 556 N.E.2d 778, 779 (1990), this court held that the *Frye* standard does not apply to the admissibility of field-sobriety test results because those tests do not constitute novel scientific evidence. In support of our conclusion in *Sides*, this court noted that field-sobriety tests, such as " ' "walk the line," "one[-]leg stand," and "finger to nose," *are not so abstruse as to require a foundation other than the experience of the officer administering them.' "* (Emphasis in original.) *Sides*, 199 Ill. App. 3d at 206, 556 N.E.2d at 779, quoting *People v. Vega*, 145 Ill. App. 3d 996, 1001, 496 N.E.2d 501, 505 (1986). Although we did not explicitly state that a police officer administering field-sobriety tests employs universally accepted and firmly established scientific methods, such as observation and deductive reasoning (as opposed to some "novel" method or technique), such an underpinning was implicit in our holding. Similarly, the opinion witnesses here employed *universally accepted* and *firmly established* scientific methods of observation and deductive reasoning.

The evidence presented clearly demonstrated that the specific method at issue here (the visual examination of plants to determine whether they have suffered herbicide or other injuries) is a method commonly used and generally accepted by agricultural extension specialists, farmers, and other persons otherwise qualified to diagnose plant injuries. Certain techniques or tests have been held admissible without a *Frye* hearing when those techniques or tests are *undoubtedly* generally accepted in the relevant scientific community. See, for example, *People v. Ward*, 154 Ill. 2d 272, 316, 609 N.E.2d 252, 270 (1992) (atomic absorption analysis to determine gunshot residue is a generally accepted test used by forensic scientists to determine

whether a person has recently fired a gun). The evidence here showed that both Monaco and Dr. Darin Eastburn (another of Cropmate's opinion witnesses) visually examined either photographs or actual samples of the Harris crops in formulating their causation opinions. Monaco testified that he based his opinions, in part, on his examination of photographs of the Harris field and the Alcorn field. In addition, Eastburn, an extension specialist at the University of Illinois, testified that when a plant sample is submitted to the university's plant diagnostic clinic, it is *standard practice* to visually examine the plant sample before making a diagnosis, and some plant samples "can be diagnosed just by looking at them." He also stated that he based his opinions in this case on his visual examination of plant samples taken from the Harris field.

Moreover, 2,4-D had been introduced during the 1940s, and its effects on cucurbits do not constitute some "novel" discovery. During the 1980s, Monaco was contacted by the American Phytopathological Society to conduct research on and document (both in writing and photographically) the effects of herbicides, including 2,4-D, on cucurbits. Monaco's written findings and photographic documentation, which were published, described the symptoms of 2,4-D contact with cucurbits as including leaf petiole twisting, stem bending, leaf "feathering" and cupping, stem enlargement, misshapen fruit, and in some instances death.

Thus, we conclude that the methods utilized by the opinion witnesses in this case do not constitute some sort of "novel" method that requires the application of the *Frye* standard.

In so concluding, we note that the methods utilized by the opinion witnesses here are undoubtedly distinguishable from the scientific techniques and tests usually at issue in the type of "novel scientific evidence" cases involving *Frye*. See, for example, *Miller*, 173 Ill. 2d at 189-90, 670 N.E.2d at 732 (restriction fragment length polymorphism (RFLP) technique and product rule for calculating deoxyribonucleic acid (DNA) profile frequencies admissible under the *Frye* standard); *People v. Eyler*, 133 Ill. 2d 173, 212, 549 N.E.2d 268, 285 (1989) (evidence that superglue technique for detecting latent fingerprints had been used for eight years by police department and that those working in the field considered it to be reliable sufficient to establish that the technique is generally accepted); *People v. Zayas*, 131 Ill. 2d 284, 293, 546 N.E.2d 513, 517 (1989) (hypnotically refreshed testimony unreliable and inadmissible through any witness other than criminal defendant); *First Midwest*, 296 Ill. App. 3d at 427, 701 N.E.2d at 1114 (testimony regarding accident reconstruction experiment inadmissible under *Frye* standard); *People v. Kirk*, 289 Ill. App. 3d 326, 331-32, 681

N.E.2d 1073, 1076 (1997) (trial court should have conducted a *Frye* hearing to determine whether to admit results of a horizontal gaze nystagmus (HGN) test, a test that measures the physiological phenomenon of involuntary jerking of the eyeball, supposedly indicating ingestion of alcohol or barbiturates).

*Fifth Inquiry*: **If the trial court determines that the scientific evidence is "novel," then the court must ask, does the evidence meet the *Frye* admissibility standard?** The court can and should conduct a *Frye* evidentiary hearing when the evidence is "novel." At such a hearing, the court's first consideration is to identify the relevant scientific community to which the opinion witness belongs. Then, the court must determine whether the scientific technique or method is generally accepted within that scientific community. As we earlier noted, in *Frye*, the court wrote that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. However, as Professor Graham has written:

> "Newness alone is not a bar to admissibility, for every scientific technique that is eventually accepted must have its first day in court. Moreover, neither lack of absolute certainty nor lack of uniformity of expert opinion precludes a court from finding on the basis of expert witness testimony and other evidence admitted at trial that *** the scientific test's reliability is, or clearly would be when brought to the attention of the appropriate experts, generally accepted in the particular scientific field in which the test belongs." Handbook of Evidence § 702.4, at 563.

See also Handbook of Evidence § 401.12, at 165-67. Compare *Duran v. Cullinan*, 286 Ill. App. 3d 1005, 1013, 677 N.E.2d 999, 1004 (1997) (methodology of extrapolating data from various studies showing oral contraceptives to have a teratogenic effect, *i.e.*, resulting in a deformed fetus, was generally accepted under *Frye*), with *People v. Lowitzki*, 285 Ill. App. 3d 770, 777, 674 N.E.2d 859, 863-64 (1996) (in which the court held that the principle that a defendant lacks the capacity to conform his conduct to the requirements of the law because he suffers from pathological gambling was not generally accepted).

*Sixth Inquiry*: **After having determined that the scientific technique or method is generally accepted in the relevant scientific community, a trial court must still ask, is this evidence reliable?** Even when proponents can make a colorable claim that a particular scientific technique or method has been accepted by the appropriate scientific community, trial courts still may not delegate their

authority to the scientific community. See *First Midwest*, 296 Ill. App. 3d at 429, 701 N.E.2d at 1115 (where this court noted that even if the trial court had admitted the experimental evidence on the basis that the scientific community had somehow accepted the methodology, we still would have reversed the trial court's decision because the underlying data in that case was inherently unreliable). In serving as gate-keepers to keep out scientific evidence that constitutes nothing more than "junk science" or mere speculation, trial courts should constantly be asking, does the proffered witness have sufficient information, based upon the evidence in this case, to render a *reliable* opinion? Courts should remember that they need not—and should not—accept an expert's opinion on the basis of *ipse dixit, i.e.*, such a thing is so because I say it is so.

In determining whether the proffered evidence is reliable, the trial court may ask the following nonexclusive listing of questions as it considers the totality of the circumstances: (1) Can the scientific technique or method employed be empirically tested, and if so, has it been? (2) Has the technique or method been subjected to peer review and publication? (3) What is the technique or method's known or potential error rate? (4) Are its underlying data reliable? (5) Is the witness proposing to testify about matters growing naturally and directly out of research she has conducted independently of the litigation, or has the witness developed her opinion solely for the purpose of testifying? and (6) Did the witness form her opinion and then look for reasons to support it, rather than doing research that led her to her conclusion? See generally *Daubert*, 509 U.S. at 592-93, 125 L. Ed. 2d at 482-83, 113 S. Ct. at 2796-97; *Muzzey v. Kerr-McGee Chemical Corp.*, 921 F. Supp. 511, 518 (N.D. Ill. 1996); see also *Daubert II*, 43 F.3d at 1317.

We acknowledge that the aforementioned questions to be asked include factors discussed by the Supreme Court in *Daubert*. Even though Illinois has not, and perhaps should not, adopt the *Daubert* admissibility standard, *Daubert* nonetheless contains some nuggets that can now help Illinois courts. We stress that the trial court's inquiry at a *Frye* hearing should be a flexible one, and the above list of questions is intended to help guide the trial court in determining whether the proffered evidence is reliable. It does not constitute a six-part test, in which the proponent of the proffered evidence must answer all of the questions satisfactorily before the evidence is deemed admissible. Instead, the aforementioned questions will not be equally applicable (or applicable at all) in every case. We also stress that in applying the "*Frye* plus reliability" standard, the court must rely somewhat on the "community" of experts to help it decide the admissibility

of the proffered evidence. However, the court may not delegate its authority as gatekeeper to the scientific community. See *First Midwest*, 296 Ill. App. 3d at 428, 701 N.E.2d at 1114-15.

In conducting a *Frye* evidentiary hearing (as in any hearing to determine the admissibility of opinion testimony), the trial court is not required to strictly comply with the rules of evidence. In attempting to prove that evidence subject to *Frye* is admissible under that standard, its proponent may use—and the trial court may consider— the following: (1) scientific publications and law review articles; (2) prior judicial decisions in Illinois and other jurisdictions; (3) practical applications of the technique or method; and (4) testimony or affidavits of experts regarding (a) the acceptance of the technique or method within the relevant scientific community, and (b) the attitudes of their fellow scientists. See *Kirk*, 289 Ill. App. 3d at 332, 681 N.E.2d at 1077; see also 1 J. Strong, McCormick on Evidence § 203, at 870 (4th ed. 1992) (and cases cited therein).

Last, the trial court should provide the reviewing courts with a complete record of the proceedings. In making its ruling on the admissibility of proffered evidence under *Frye*, the trial court should state the evidence and information it relied upon, make necessary findings of fact, and provide the reasons underlying its decision.

### 3. Alleged Speculation and Conjecture

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### 4. Alleged Spoliation of Evidence

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### B. The Trial Court's Refusal To Admit the Goetsch Letter

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### C. The Trial Court's Refusal To Allow One of Cropmate's Witnesses the Opportunity To Give an Opinion Based upon a Photograph of the Harris Field

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### D. Sufficiency of the Evidence at the Bench Trial on the Issue of Liability

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### E. The Damages Award

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## III. EPILOGUE

Because of the page limitations imposed under the administrative order entered June 27, 1994, in relation to revised Supreme Court Rule 23 (166 Ill. 2d R. 23, at xix (administrative order)), we are compelled to delete our discussion of the other issues we addressed in this decision from its published portion. However, our discussion of these issues is part of the unpublished portion of this decision.

In brief summary for the benefit of the reader of the published decision, the other issues we addressed in this decision are as follows. Cropmate argued that because the causation testimony of Kregel, Hager, and Scott was based solely on speculation and conjecture, it was unreliable. We disagreed, noting that the testimony of Kregel and Hager was based upon their personal observations of the Harris crops. Regarding Scott's testimony, we noted that (1) he based his opinion, in part, on Kregel's opinion that the anthracnose infestation in the Harris field was "slight"; and (2) even though Kregel's opinion of what constituted slight or severe anthracnose infestation contradicted Scott's opinion, we concluded that these circumstances did not demonstrate that Scott's opinion included so many uncertain factors that he was required to guess to reach his conclusion. Instead, these circumstances constitute topics more appropriately explored on cross-examination.

Cropmate also argued that the court erred by refusing to admit into evidence a letter written by the chief of an Illinois Department of Agriculture bureau and sent to Patrick Harris, which stated that the Department had determined that an enforceable herbicide misuse violation had not occurred (the Goetsch letter), where the letter— according to Cropmate—should have been admitted under the public record or business record exception to the hearsay rule. We concluded that Cropmate has forfeited on appeal its theories of admissibility under the hearsay exception by failing to raise those theories initially in the trial court.

Cropmate also argued that the court committed reversible error when it restricted Eastburn's testimony regarding certain photographs of the Harris field on the ground that such testimony would constitute previously undisclosed opinions in violation of Supreme Court Rule 213(g) (166 Ill. 2d R. 213(g)). We concluded that Eastburn's proffered opinion testimony regarding the Harris field, based upon his visual examination of certain photographs of the field, was inconsistent with

both his diagnosis of plant samples taken from the Harris field and his deposition testimony. Thus, the court did not abuse its discretion by limiting his testimony to his previously disclosed opinions, pursuant to Rule 213(g).

Cropmate also argued that the court's finding that the Harrises' crop yield loss resulted from Cropmate's negligent spraying of 2,4-D was against the manifest weight of the evidence. We concluded that the court's findings in this bench trial were not against the manifest weight of the evidence.

Last, Cropmate argued that the damages award was clearly excessive and against the manifest weight of the evidence. We concluded that the court's damages award was not manifestly erroneous.

A full, unabridged text of this decision is on file with the clerk of this court under docket No. 4—98—0269.

## IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, P.J., and GARMAN, J., concur.