January 26, 1999

NO.
 4-98-0269

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FRANCIS PATRICK HARRIS and ) Appeal from 

LINDA N. HARRIS, ) Circuit Court of 

Plaintiffs-Appellees, ) Cass County

v. ) No. 95L14

CROPMATE COMPANY, a Corporation ) 

d/b/a THE RICHTER COMPANY, and ) Honorable

ROBERT SCHONE, ) Robert L. Welch,

Defendants-Appellants. ) Judge Presiding.

________________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

 

In January 1996, plaintiffs, Francis Patrick Harris and Linda N. Harris (the Harrises), sued defendants, Cropmate Compa­ny, d/b/a the Richter Company (Cropmate), and Robert Schone, one of Cropmate's employees, alleging that Cropmate and Schone had negligently sprayed a herbicide on farmland adjacent to a 50-acre tract of land rented and farmed by the Harrises, causing damage to the Harrises' water­mel­on, cantaloupe, and pumpkin crops.  In October 1997, the trial court conducted a bench trial, granted a motion for directed verdict in Schone's favor, and ultimately entered judg­ment against Cropmate and in favor of the Harrises, awarding them damages.

Cropmate appeals, arguing that (1) the trial court erred by (a) refusing to admit a letter written by a bureau chief of the Illinois Department of Agriculture, (b) admitting the testi­mo­ny of three of the Harrises' opinion wit­nesses, and (c) limit­ing the testimony of one of Cropmate's opinion witness­es; (2) the court's finding that the Harrises' crop yield loss resulted from Cropmate's negligent spraying of the herbicide 2,4-D was against the manifest weight of the evidence; and (3) the damages award was clearly excessive and against the manifest weight of the evi­dence.  We affirm.  

I.  BACKGROUND  

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)

II.  ANALYSIS      

A.  The Trial Court's Decision To Admit the Testimony of

the Harrises' Opinion Witnesses

1.  
The Daubert Standard

Initially, we address Cropmate's suggestion that this court should adopt the "admissibility standard for expert opin­ion" articulated in 
Daubert v. Merrell Dow Pharmaceuticals, Inc.
, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).  We de­cline to do so.

Since the Supreme Court's decision in 
Daubert
, the  Supreme Court of Illinois has adhered to the "general acceptance" standard for the admission of novel scientific evidence estab­lished in 
Frye v. United States
, 293 F. 1013, 1014 (D.C. Cir. 1923).  See 
People v. Hickey
, 178 Ill. 2d 256, 277, 687 N.E.2d 910, 920 (1997); 
People v. Miller
, 173 Ill. 2d 167, 187, 670 N.E.2d 721, 731 (1996); 
People v. Moore
, 171 Ill. 2d 74, 96, 662 N.E.2d 1215, 1225 (1996).  In 
Miller
, the court ac­knowl­edged that the Supreme Court in 
Daubert
 held that the 
Frye
 "general acceptance" standard no longer applies in federal cases and, instead, Federal Rule of Evidence 702 (see 28 U.S.C. app. Fed. R. Evid. 702 (1994)) applies in those cases.  Nonethe­less, the 
Miller
 court de­clined to address 
sua
 
sponte
 the issue of whether it should abandon the 
Frye
 standard and adopt the reason­ing of 
Daubert
.  
Miller
, 173 Ill. 2d at 187 n.3, 670 N.E.2d at 731 n.3.  

The decision whether to change long-standing, fundamen­tal rules of Illinois evidence law lies within the discretion of the Supreme Court of Illinois, not this court.  Further, even if we did possess that discretion, we are not at all sure 
Daubert
 should be adopted in this State--at least, not at the present.  We note that legal schol­ars do not share Cropmate's enthu­siasm regarding 
Daubert
.  See M. Gra­ham, Cleary & Graham's Hand­book of Illi­nois Evi­dence §702.4, at 565 (6th ed. 1994) (hereaf­ter Handbook of Evidence) ("[M]any theo­retical and practi­cal argu­

ments support Illinois retain­ing adherence to 
Frye
, at least until the impact of 
Daubert
 is fully understood"); see also 2 M. Gra­ham, Handbook of Federal Evidence §702.5, at 34 (4th ed. Supp. 1999), in which Profes­

sor Michael H. Graham made the following comments:

"
Daubert
 boxed the courts into working within a structure that has not functioned as anticipated by the Supreme Court and can fairly be said not to have functioned well at all.  The Supreme Court sought to encourage liberal admissibility.  It believed that it was abolishing a strict 
Frye
 test in favor of a more liberal factor[-]balancing analyses.  In fact, liberality of admissibility has not occurred."  

2.  
Admissibility of the Opinion Testimony 

Under the Frye Stan­dard

Cropmate alternatively argues that even if this court decides not to adopt the 
Daubert
 standard, the "proper applica­tion of th[e] 
Frye
 standard" would have precluded the testi­mony of Derrill Kregel, Aaron Hager, and Dr. Dennis Scott--the Harrises' three opinion witness­es.  Specif­i­cal­ly, Cropmate con­tends that no evidence exists that the "com­

para­tive symptomology" technique employed by those witnesses--that is, their visual examination of plants to deter­mine whether they have suffered damage from exposure to 2,4-D--is gener­al­ly accept­ed by the rele­vant scien­tif­ic commu­ni­ty.  Because we conclude that the testimo­ny at issue falls outside 
Frye
's scope, we dis­agree with Cropmate's conten­

tion.

Initially, we note that Cropmate never requested a 
Frye
 evidentiary hearing before the trial court.  (Nor did Cropmate's motion to strike the testimony of Kregel and Scott--in which Cropmate argued 
only
 that the testimony should be excluded under the 
Daubert
 stan­dard--

request an evidentiary hear­ing.)  Although Cropmate's failure to request such a hearing may well constitute a forfei­ture of this issue on appeal, we nonetheless address Cropmate's argument on the merits.  See 
Zekman v. Direct American Market­ers, Inc.
, 182 Ill. 2d 359, 368, 695 N.E.2d 853, 858 (1998) (in general, the forfei­ture doctrine is an admoni­tion to the liti­gant, not a limitation on the jurisdiction of the review­ing court).

As earlier discussed, Illinois follows the 
Frye
 stan­dard for the admission of "novel scientific evidence."  
Miller
, 173 Ill. 2d at 187, 670 N.E.2d at 731.  The 
Frye
 court explained the standard as follows:

"Just when a scientific principle or discov­ery crosses the line between the exper­imental and demonstrable stages is difficult to de­fine.  Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony de­duced from a well-recog­nized scientific principle or discovery, the thing from which the deduc­tion is made must be sufficiently established to have gained gener­al acceptance in the particular field in which it belongs."  
Frye
, 293 F. at 1014. 

Professor Graham has written that imposing the 
Frye
 admis­si­

bil­i­ty stan­dard serves to accomplish the following:

"(1) ensure that a minimal reserve of experts exist who can critically examine the validity of a scientific determination in a particular case, (2) promote a degree of uniformity of decision, (3) avoid the inter­jection of a time[-]consuming and often mis­leading determination of the reliability of a scientific technique into the litigation, (4) assure that scientif­ic evidence introduced will be reliable, [citation], and thus rele­vant, (5) provide a preliminary screening to protect against the natural inclination of the jury to assign significant weight to scientif­ic techniques pre­

sented under circum­stances where the trier of fact is in a poor position to place an accurate evalua­

tion upon reliabil­ity, and (6) impose a threshold stan­dard of reliability, in light of the fact that cross-examination by opposing counsel is unlikely to bring inaccuracies to the atten­tion of the jury."  Handbook of Evidence  §702.4, at 562.

See also J. Strong, 
Questions
 
Affecting
 
the
 
Admissibility
 
of
 
Scien­tific
 
Evidence
, 1970 U. Ill. L. F. 1, 14 (the 
Frye
 stan­dard seeks "preven­tion of the intro­duction into evidence of specious and unfounded scientific principles or conclusions based upon such princi­ples").   

In 
First Midwest Trust Co. v. Rogers
, 296 Ill. App. 3d 416, 427, 701 N.E.2d 1107, 1114 (1998), citing Handbook of Evidence §702.4, at 562-63, this court, citing Professor Graham, recent­ly dis­cussed the applica­tion of the 
Frye
 stan­dard and wrote the follow­ing:

"In applying the 
Frye
 standard, the trial court must determine that (1) the sci­entific test is reli­able; and (2) the test's reliability is generally accepted in the particular scientific field to which the test belongs."  

Thus, following Professor Graham's lead, it appears that Illinois utiliz­

es a "
Frye
 plus reli­abil­i­ty" stan­dard for admission of "novel scien­tific evi­dence."  See Handbook of Evidence §702.4, at 559-63. 

To assist trial courts in applying the "
Frye
 plus reliabili­ty" standard, we recommend they use the following analyt­i­cal frame­work, consisting of a series of inquiries to be raised in the order shown.

First
 
Inquiry
:  Precisely what evidence is being prof­fered?
  In this case, the Harrises prof­fered the testimony of Kregel, Hager, and Scott that exposure to 2,4-D had caused the injuries to the Harris crops, based upon their visual examination of the plants.  In Scott's case, he based his opinion that 2,4-D had caused the injuries to the Harris crops, in part, on his visual examination of the video­tape of the Harris field. 

Second
 
Inquiry
:  Will the proffered testimony assist the trier of fact to under­stand the evi­dence or determine facts in issue, or can the trier of fact use its own knowl­edge and experi­ence?
  See, for example, 
People v. Enis
, 139 Ill. 2d 264, 289, 564 N.E.2d 1155, 1164-65 (1990) (in which the supreme court upheld the trial court's rejection of the defendant's proffered testimo­ny regard­ing the reli­ability of eyewitness testimony because such testimo­ny would not have aided the trier of fact in reaching its conclu­sion); 
People v. Simpkins
, 297 Ill. App. 3d 668, 683, 697 N.E.2d 302, 311-12 (1998) (in which this court held that the trial court abused its discretion by allowing testimony regarding recantation by child victims of sexual abuse because such testi­mony (1) did not aid the jury in reaching its conclu­sion, and (2) se­verely impinged upon the province of the jury to determine credibil­ity and assess the facts of the case).  If the court determines that the testi­mo­ny will not assist the trier of fact, that ends the inquiries regarding the proffered testimony, and the court should then reject it.  In the present case, Cropmate does not contend on appeal that the causa­

tion testi­mo­ny at issue would not have assist­ed the trier of fact.  

Third
 
Inquiry
:  If the trial court determines that the prof­

fered testimony will assist the trier of fact to understand the evi­dence or deter­mine facts in issue, then the court must ask, does the evidence constitute "sci­ence"--that is, does the prof­fered testimony constitute "scien­tif­ic" evi­dence?
  If the testimo­ny does not consti­tute scientific evi­dence, then the 
Frye
 admis­si­bility standard does not apply.  Nonethe­

less, the trial court may still conduct a hearing into the reliability of the proffered testimo­ny.  

Although Illinois has not adopted the 
Daubert
 stan­dard for admission of scien­tific opinion testimo­ny, the Supreme Court's discus­sion regarding what consti­tutes "scien­tific knowl­edge" can still inform our analysis of what consti­tutes scientif­ic opinion testimony.  In 
Daubert
, the Court noted that the words "scientif­ic" and "knowl­edge," respec­

tively, imply "a grounding in the methods and proce­dures of science" and "more than subjective belief or unsupported specula­tion."  The Court added that to qualify as "`scientif­ic knowl­edge,' an infer­ence or assertion must be derived by the scientif­ic method."  
Daubert
, 509 U.S. at 590, 125 L. Ed. 2d at 481, 113 S. Ct. at 2795.  Thus, in short, "a scien­tif­ic expert is an expert who relies on the application of scientif­

ic princi­ples, rather than on skill or experience-based observa­tions, for the basis of his opinion."  
Carmichael v. Samyang Tire Inc.
, 131 F.3d 1433, 1435 (11th Cir. 1997), 
cert
. 
granted
 
sub
 
nom
.  
Kumho Tire Co. v. Carmichael
, 141 L. Ed. 2d 711, 118 S. Ct. 2339 (1998) (on question of whether 
Daubert
 applies to admis­si­bil­i­ty of all expert testimony (see 66 U.S.L.W. 3723)).  In 
Berry v. City of De­troit
, 25 F.3d 1342, 1349-50 (6th Cir. 1994), the court ex­plained this distinc­tion as follows: 

"The distinction between scientific and non-

sci­entific expert testimony is a critical one.  By way of illus­tration, if one wanted to explain to a jury how a bumblebee is able to fly, an aero­nauti­

cal engineer might be a helpful witness.  Since flight principles have some universality, the expert could apply general principles to the case of the bumble­bee.  Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.

On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an accept­able expert wit­ness 
if
 a proper foun­

dation were laid for his conclusions.  The foun­

dation would not relate to his formal training, but to his firsthand observations.  In other words, the beekeeper does not know any more about flight princi­ples than the jurors, but he has seen a lot more bumblebees than they have."  (Emphasis in original.)

Although the 
Berry
 court's beekeeper/aeronautical engineer comparison certain­ly provides insight into the distinction between a scien­tific expert and a nonscientific expert, it risks confus­ing the distinction between the trial court's questioning an expert's qualifications and the nature of an expert's testimo­ny.  Specifi­cally, the 
Berry
 court noted that the beekeeper's testimo­ny could be used to prove that bumblebees always take off into the wind, but the court did not address exactly what testi­mony the beekeep­er could give to prove that proposition--that is, 
how
 he reached his conclusion regarding bumble­bee flight pat­terns.  That should be the court's focus in deter­min­ing whether an expert's testimony consti­tutes "scien­tif­ic" opinion testi­mony.

Thus, the beekeeper may opine, based upon his many years of observing bees taking flight, that bees always take off into the wind.  He may also state, "If the bees take off heading due west, you can be sure the wind is blowing from the west."  The beekeeper may give those opinions because he reached those conclusions by combining only (1) his generalized knowledge of bees; (2) his firsthand obser­vations of bees; and (3) the type of deductive process that is common to every­one.  In reaching his conclusions, the beekeep­er did not utilize some special scientif­ic technique or method, such as by performing some sort of calculation based on general flight princi­ples.  On this point, see 
Compton v. Subaru of Ameri­ca, Inc.
, 82 F.3d 1513, 1518 (10th Cir. 1996), holding that the 
Daubert
 stan­dard for admission of scien­tific evidence did not apply when the engi­neering testi­mony at issue was not based on any partic­ular scientific method­ol­o­gy or tech­nique but "upon general engi­neering principles and *** years of experi­ence as an automo­tive engi­

neer."   

Even though the beekeeper's testimony relates to several fields of science, and even though a different expert may have reached the same conclu­sion using some specific, advanced scien­tific technique or method, the beekeeper's testimony escapes the 
Frye
 analysis because his opinion testimony represents nothing more than his experience and observations, combined with a deductive process familiar to the average trier of fact.  Thus, the need for the trial court to "provide a preliminary screening to protect against the natural inclination of the jury to assign significant weight to scientific techniques" does not exist regarding the beekeeper.  Simply because scientific princi­ples 
relate
 
to
 aspects of an opinion witness' testimony does not trans­form that testimo­ny into "scien­tific" testimony.  For example, in 
United States v. Starzecpyzel
, 880 F. Supp. 1027, 1041 (S.D.N.Y. 1995), the court held that foren­sic docu­ment examina­tion expertise consti­tuted "techni­cal, or other special­ized knowledge" under Rule 702, not "scien­

tific knowl­edge," even though chemis­try, physics, and mathe­mat­ics clearly were implicated in the work of forensic document examin­ers.  See also 
Daubert v. Merrell Dow Pharmaceuti­cals, Inc.
, 43 F.3d 1311, 1315-16 (9th Cir. 1995) (
Daubert
 II) (in which the ninth circuit, on remand from the Supreme Court, noted that "some­thing doesn't become `scien­tif­ic knowl­

edge' just because it's uttered by a scientist").  

We stress that the beekeeper/aeronautical engi­neer compar­i­son is intended to pro­vide a helpful metaphor to assist trial courts in deter­min­ing whether proffered opinion testimony constitutes "scien­tif­ic" evidence.  However, we do not mean to suggest that opinion testi­mony is typical­ly so easily classified into "scientific" and "non­sci­entif­ic" evidence.  Instead, the scientific/nonscientific dichot­o­my may best be viewed as a continuum, at one end of which the dis­tinc­tion between "scientific" and "non­sci­entif­ic" evidence is clear, such as in the case of the bee­keep­er versus the aero­nau­tical engi­neer.  Moving down the continu­um, the distinction begins to blur, and at the oppo­site end, no obvious clear demar­cation exists between "scien­tif­ic" and "nonsci­entific" evidence, such as in the case of a foren­sic document examiner, for example.  See 
Starzecpyzel
, 880 F. Supp. at 1041 (for a discussion of whether the testimony of forensic docu­ment examin­ers constitutes "scientific" evidence).

Here, ­bota­ny and chemis­try were undisputedly implicat­ed in the testi­mo­ny of Kregel (a seed salesman with several years' experience applying 2,4-D), Hager (an extension specialist and doctoral student in weed science who had read the literature and conduct­ed field research on the effects of 2,4-D), and Scott (a research biologist who had become ac­

quainted during the course of his work as an extension specialist with the effects of phenoxy-type herbicides, including 2,4-D, on cucurbits).  Howev­er, none of these experts pur­ported to have relied on some particular scien­tific principle or method­olo­gy to deter­mine whether exposure to 2,4-D had caused the inju­ries to the Harris crops.  (Unlike Dr. Thomas Monaco, one of Cropmate's opinion witnesses, who had performed a "calcu­la­tion" to determine the concen­tration of 2,4-D that had drifted from a nearby field onto the Harris field.)   Indeed, Kregel, Hager, and Scott all ac­knowl­edged that they did not know and had not calcu­lated the minimum concen­tra­tion of 2,4-D neces­sary to cause crop yield loss.  Instead, akin to the beekeeper, Kregel, Hager, and Scott reached their conclusions that expo­sure to 2,4-D had caused the inju­ries to the Harris crops by combining (1) their gener­alized knowl­edge of agricul­ture, including crops and weeds; (2) their firsthand experi­ence with and observations of the effects of exposure to 2,4-D upon cucurbits; and (3) the type of deduc­tive process that is common to everyone.   

Thus, we conclude that the causation testimony of Kregel, Hager, and Scott did not consti­tute "scientific" evi­dence.  According­ly, their opinion testi­mo­ny fell outside the scope of 
Frye
. 

Fourth
 
Inquiry
:  If the trial court determines that the prof­

fered testi­mo­ny consti­tutes scien­tif­ic evi­dence, then the court must ask, is that scien­tif­ic evi­dence "nov­el," or does it involve instead a firmly estab­lished method or technique?
  In making this determi­nation, the court should ascertain whether any controlling prece­dent, which is on point, exists.  See, for example, 
People v. Camp­bell
, 146 Ill. 2d 363, 376-77, 586 N.E.2d 1261, 1267 (1992) (noting that "corre­spon­dence of foot­prints found at the scene of a crime with the sole of one accused of the crime has long been admissible as competent evidence in an attempt to identify the accused as the guilty person").  If the scientific evidence is not "novel," then the 
Frye
 admissibility standard has been satisfied--that is, the scientific method or technique has been generally accepted in the relevant scientific community.  Howev­er, as we earlier noted, the court still may conduct a hearing into the reli­abil­i­ty of the prof­fered testimo­ny.   

In the present case, even assuming that the methods employed by the Harrises' opinion witnesses constituted scien­tific methods and thus fell within the realm of "scien­tif­ic" evi­dence, we nonethe­less con­

clude that these methods are not "nov­el."  Neither Kregel, Hager, nor Scott purport­ed to have relied upon some "[s]trikingly new, unusual, or differ­ent" (as the word "novel" is defined by the Ameri­can Heri­tage Dic­

tionary of the English Lan­guage 898 (1975)) method in reaching their opinions.  In 
People v. Sides
, 199 Ill. App. 3d 203, 206, 556 N.E.2d 778, 779 (1990), this court held that the 
Frye
 stan­dard does not apply to the admissibility of field-sobri­ety test results because those tests do not consti­tute novel scien­tific evi­dence.  In support of our conclusion in 
Sides
, this court noted that field-sobri­ety tests, such as "`"walk the line," "one[-]leg stand," and "finger to nose," 
are
 
not
 
so
 
abstruse
 
as
 
to
 
require
 
a
 
founda­tion
 
other
 
than
 
the
 
experi­ence
 
of
 
the
 
officer
 
administer­ing
 
them
.'"  (Emphasis in origi­nal.)  
Sides
, 199 Ill. App. 3d at 206, 556 N.E.2d at 779, quoting 
People v. Vega
, 145 Ill. App. 3d 996, 1001, 496 N.E.2d 501, 505 (1986).  Al­though we did not explic­it­ly state that a police officer admin­is­ter­ing field-sobriety tests employ­s univer­

sally accepted and firmly established scien­tific meth­ods, such as observa­tion and deduc­tive reason­ing (as opposed to some "novel" method or technique), such an under­pin­ning was implic­it in our holding.  Similarly, the opinion wit­nesses here employed 
univer­sally
 
accepted
 and 
firmly
 
established
 scien­tific methods of observation and deductive reasoning. 

The evi­dence pre­sent­ed clearly demon­strat­ed that the specif­ic method at issue here (the visual exami­na­tion of plants to deter­mine whether they have suffered herbicide or other injuries) is a method commonly used and generally accepted by agri­cul­tur­al exten­sion spe­cial­

ists, farmers, and other persons otherwise quali­fied to diagnose plant injuries.  Certain tech­niques or tests have been held admissible without a 
Frye
 hearing when those tech­niques or tests are 
un­doubtedly
 generally accepted in the rele­vant scien­tific commu­nity.  See, for example, 
People v. Ward
, 154 Ill. 2d 272, 316, 609 N.E.2d 252, 270 (1992) (atomic absorp­

tion analy­sis to deter­mine gunshot residue is a gener­al­ly accept­ed test used by foren­sic scien­tists to determine whether a person has recently fired a gun).  The evi­dence here showed that both Monaco and Dr. Darin Eastburn (another of Cropmate's opinion witness­es) visually exam­ined either photo­graphs or actual samples of the Harris crops in formu­lating their causation opinions.  Monaco testi­fied that he based his opin­ions, in part, on his examination of photographs of the Harris field and the Alcorn field.  In addi­tion, Eastburn, an extension specialist at the University of Illinois, testified that when a plant sample is submitted to the university's plant diagnostic clinic, it is 
stan­dard
 
prac­tice
 to visual­ly examine the plant sample before making a diagno­sis, and some plant samples "can be diag­nosed just by looking at them."  He also stated that he based his opinions in this case on his visual examina­tion of plant samples taken from the Harris field. 

Moreover, 2,4-D had been intro­duced during the 1940s, and its effects on cucurbits do not consti­tute some "nov­el" discovery.  During the 1980s, Monaco was con­tacted by the Ameri­can Phyto­patho­logi­cal Society to conduct research on and document (both in writing and photo­graph­

ically) the effects of herbi­cides, includ­ing 2,4-D, on cucurbits.  Monaco's written find­ings and photo­graphic documenta­tion, which were pub­

lished, described the symptoms of 2,4-D contact with cucurbits as includ­

ing leaf petiole twist­ing, stem bending, leaf "feathering" and cupping, stem enlarge­ment, mis­shapen fruit, and in some instances death.  

Thus, we conclude that the methods utilized by the opinion witnesses in this case do not constitute some sort of "novel" method that requires the application of the 
Frye
 stan­dard.

In so concluding, we note that the methods utilized by the opinion witnesses here are undoubtedly distin­guish­able from the scien­tif­

ic tech­niques and tests usually at issue in the type of "novel scientif­ic evidence" cases involving 
Frye
.  See, for example, 
Miller
, 173 Ill. 2d at 189-90, 670 N.E.2d at 732 (restric­tion fragment length polymor­phism (RFLP) tech­nique and product rule for calcu­lat­ing deoxy­ribonucleic acid (DNA) profile frequen­cies admissible under the 
Frye
 standard); 
People v. Eyler
, 133 Ill. 2d 173, 212, 549 N.E.2d 268, 285 (1989) (evidence that superglue tech­nique for detecting latent finger­prints had been used for eight years by police department and that those working in the field consid­ered it to be reliable sufficient to establish that the technique is generally accept­ed); 
People v. Zayas
, 131 Ill. 2d 284, 293, 546 N.E.2d 513, 517 (1989) (hypnoti­cally re­freshed testimony unreli­able and inad­

missi­ble through any witness other than criminal defendant); 
First Midwest
, 296 Ill. App. 3d at 427, 701 N.E.2d at 1114 (testi­mony regard­ing accident recon­struc­tion experi­ment inadmis­sible under 
Frye
 standard); 
People v. Kirk
, 289 Ill. App. 3d  326, 331-32, 681 N.E.2d 1073, 1076 (1997) (trial court should have conducted a 
Frye
 hearing to deter­mine whether to admit results of a horizontal gaze nystagmus (HGN) test, a test that measures the physiolog­ical phenomenon of involuntary jerking of the eyeball, supposedly indi­cating inges­tion of alcohol or barbi­tu­

rates).  

Fifth
 
Inquiry
:  If the trial court determines that the scien­

tif­ic evi­dence is "nov­el," then the court must ask, does the evi­dence meet the 
Frye
 admis­si­bil­i­ty standard?
  The court can and should conduct a 
Frye
 eviden­tiary hear­ing when the evidence is "novel."  At such a hear­

ing, the court's first consider­ation is to identify the rele­vant scien­

tif­ic commu­ni­ty to which the opinion witness belongs.  Then, the court must deter­mine whether the scien­tif­ic tech­nique or method is gener­al­ly accept­ed within that scientific community.  As we earlier noted, in 
Frye
, the court wrote that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scien­tific principle or discovery, the thing from which the deduction is made must be sufficient­

ly established to have gained general acceptance in the particu­lar field in which it belongs."  
Frye
, 293 F. at 1014.  However, as Professor Graham has written: 

"Newness alone is not a bar to admissibility, for every scientific technique that is even­tually accepted must have its first day in court.  More­

over, neither lack of absolute certainty nor lack of uniformity of expert opinion precludes a court from finding on the basis of expert witness tes­

timony and other evidence admitted at trial that *** the scien­tific test's reli­ability is, or clear­

ly would be when brought to the attention of the ap­propriate experts, generally ac­cepted in the particular scientific field in which the test belongs."  Handbook of Evidence §702.4, at 563.

See also Handbook of Evidence §401.12, at 165-67.  Compare 
Duran v. Cullinan
, 286 Ill. App. 3d 1005, 1013, 677 N.E.2d 999, 1004 (1997) (method­ology of extrap­olating data from various studies showing oral contra­cep­tives to have a teratogenic effect, 
i.e.
, result­ing in a deformed fetus, was gener­al­ly accept­ed under 
Frye
), with 
People v. Lowitzki
, 285 Ill. App. 3d 770, 777, 674 N.E.2d 859, 863-64 (1996) (in which the court held that the princi­ple that a defen­dant lacks the capacity to conform his conduct to the require­ments of the law because he suffers from pathological gambling was not general­ly accepted).  
 

Sixth
 
Inquiry
:  After having determined that the scien­tif­ic tech­nique or method is generally accepted in the relevant scien­tific communi­ty, a trial court must still ask, is this evidence reliable?
  

Even when proponents can make a colorable claim that a particular scientific technique or method has been accepted by the appropriate scien­tific community, trial courts still may not delegate their authority to the scientific community.  See 
First Mid­west
, 296 Ill. App. 3d at 429, 701 N.E.2d at 1115 (where this court noted that even if the trial court had admitted the experimental evidence on the basis that the scientific community had somehow accepted the methodology, we would still have re­

versed the trial court's decision because the under­ly­ing data in that case was inherently unreliable).  In serving as gate­keep­ers
 to keep out scientific evidence that constitutes nothing more than "junk science" or mere speculation, trial courts should con­stantly be asking, does the prof­fered witness have suffi­cient informa­tion, based upon the evidence in this case, to render a 
reli­able
 opin­ion?  Courts should remember that they need not--and should not--accept an expert's opinion on the basis of 
ipse
 
dixit
, 
i.e.
, such a thing is so because I say it is so.  

In determining whether the proffered evidence is reliable, the trial court may ask the follow­ing nonexclusive listing of questions
 as it considers the totali­ty of the circumstances:  (1) Can the scien­tif­ic tech­nique or method em­ployed be empiri­cally tested, and if so, has it been? (2) Has the tech­nique or method been sub­ject­ed to peer re­view and publi­cation?  (3) What is the tech­nique or method's known or poten­tial error rate? (4) Are its underly­ing data reli­able? (5) Is the witness propos­ing to testify about matters growing natural­ly and directly out of research she has con­ducted independently of the litigation, or has the witness devel­oped her opinion solely for the purpose of testify­ing? and (6) Did the witness form her opinion and then look for reasons to support it, rather than doing research that led her to her conclusion?  See generally 
Daubert
, 509 U.S. at 592-93, 125 L. Ed. 2d at 482-83, 113 S. Ct. at 2796-97; 
Muzzey v. Kerr-McGee Chemical Corp.
 921 F. Supp. 511, 518 (N.D. Ill. 1996); see also 
Daubert II
, 43 F.3d at 1317.  

We acknowledge that the aforementioned questions to be asked include factors discussed by the Supreme Court in 
Daubert
.  Even though Illi­nois has not, and perhaps should not, adopt the 
Daubert
 admissi­bility standard, 
Daubert
 nonethe­less con­tains some nuggets that can now help Illinois courts.
  We stress that the trial court's inquiry at a 
Frye
 hearing should be a flexi­ble one,
 and the above list of ques­tions is intended to help guide the trial court in determining whether the proffered evidence is reliable.  It does not constitute a six-part test, in which the proponent of the proffered evidence must answer all of the questions satisfactorily before the evidence is deemed admissi­ble.  Instead, the afore­men­tioned ques­tions will not be equally applicable (or applicable at all) in every case.  We also stress that in apply­ing the "
Frye
 plus reli­ability" standard, the court must rely some­what on the "commu­nity" of experts to help it decide the admissi­bil­ity of the proffered evidence.  Howev­er, the court may not dele­gate its authority as gatekeep­er to the scien­tific commu­nity.  See 
First Mid­west
, 296 Ill. App. 3d at 428, 701 N.E.2d at 1114-15.    

In conducting a 
Frye
 evidentiary hearing (as in any hearing to determine the admissibility of opinion testimony), the trial court is not re­quired to strictly comply with the rules of evidence.  In attempting to prove that evidence subject to 
Frye
 is admissible under that standard, its proponent may use--and the trial court may consid­er--the following:  (1) scientific publica­tions and law review arti­cles; (2) prior judicial deci­sions in Illi­nois and other jurisdic­tions; (3) practi­cal appli­cations of the technique or method; and (4) testimony or affidavits of experts regarding (a) the acceptance of the technique or method within the relevant scien­tific community, and (b) the attitudes of their fellow scien­tists.  See 
Kirk
, 289 Ill. App. 3d at 332, 681 N.E.2d at 1077; see also 1 J. Strong, McCormick on Evi­dence §203, at 870 (4th ed. 1992) (and cases cited there­in).

Last, the trial court should provide the review­ing courts with a complete record of the proceedings.  In making its ruling on the admissibility of proffered evidence under 
Frye
, the trial court should state the evi­dence and information it relied upon, make neces­sary find­

ings of fact, and provide the reasons underlying its deci­sion. 

3.  
Alleged Speculation and Conjecture

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)

4.  
Alleged Spoliation of Evidence

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)

B.  The Trial Court's Refusal To Admit the Goetsch Letter

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)
 

C.  The Trial Court's Refusal To Allow One of Cropmate's 

Witnesses the Opportunity To Give an Opinion Based upon

a Photograph of the Harris Field

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)
 

D.  Sufficiency of the Evidence at the Bench Trial

on the Issue of Liability

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)
 

E.  The Damages Award

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

(Nonpublishable material under Supreme Court Rule 23 omitted.)
 

III.  EPILOGUE

Because of the page limita­tions imposed under the administra­

tive order entered June 27, 1994, in relation to revised Supreme Court Rule 23 (166 Ill. 2d R. 23, at xix (adminis­trative order)), we are compelled to delete our discussion of the other issues we addressed in this decision from its published portion.  Howev­er, our discussion of these issues is part of the unpub­lished portion of this deci­sion.

In brief summary for the benefit of the reader of the published decision, the other issues we addressed in this deci­sion are as follow­s.  Cropmate argued that because the causation testimony of Kregel, Hager, and Scott was based solely on specu­lation and conjec­ture, it was unreliable.  We disagreed, noting that the testi­mo­ny of Kregel and Hager was based upon their personal observa­tions of the Harris crops.  Regard­ing Scott's testi­mo­ny, we noted that (1) he based his opin­ion, in part, on Kregel's opinion that the anthrac­nose infes­ta­tion in the Harris field was "slight"; and (2) even though Kregel's opinion of what consti­

tut­ed slight or severe an­thracnose infesta­tion contra­dicted Scott's opinion, we concluded that these circum­stances did not demonstrate that Scott's opinion includ­ed so many uncer­tain factors that he was required to guess to reach his conclu­sion.  Instead, these circumstances consti­

tute topics more appro­priately ex­plored on cross-exami­nation.  

Cropmate also argued that the court erred by refus­ing to admit into evi­dence a letter written by the chief of an Illinois Depart­ment of Agriculture bureau and sent to Patrick Harris, which stated that the Depart­ment had determined that an enforce­able herbicide misuse viola­tion had not occurred (the Goetsch letter), where the letter--accord­ing to Cropmate--should have been admit­ted under the public record or busi­ness record excep­tion to the hearsay rule.  We con­cluded that Cropmate has for­feit­ed on appeal its theories of admissibil­ity under the hearsay excep­tion by failing to raise those theo­ries initially in the trial court.  

Cropmate also argued that the court commit­ted revers­ible error when it re­stricted Eastburn's testi­mo­ny regard­ing certain photo­graphs of the Harris field on the ground that such testimony would consti­tute previ­ously undis­closed opinions in violation of Supreme Court Rule 213(g) (166 Ill. 2d R. 213(g)).  We concluded that Eastburn's prof­fered opinion testimo­ny regard­ing the Harris field, based upon his visual exami­na­tion of certain photographs of the field, was inconsistent with both his diagno­sis of plant samples taken from the Harris field and his deposi­tion testi­mony.  Thus, the court did not abuse its discre­tion by limiting his testi­mo­ny to his previously disclosed opin­ions, pursuant to Rule 213(g). 

Cropmate also argued that the court's finding that the Harrises' crop yield loss result­ed from Cropmate's negligent spraying of 2,4-D was against the manifest weight of the evi­dence.  We conclud­ed that the court's findings in this bench trial were not against the mani­fest weight of the evidence.   

Last, Cropmate argued that the damages award was clearly excessive and against the manifest weight of the evi­dence.  We con­cluded that the court's damages award was not manifest­ly errone­ous.  

A full, unabridged text of this decision is on file with the clerk of this court under docket No. 4-98-0269.  

IV.  CONCLUSION

For the reasons stated, we affirm the trial court's judg­ment.

Affirmed. 

KNECHT, P.J., and GARMAN, J., concur.